OPINION
{¶ 1} In this consolidated action, plaintiff-appellant, The Ravines at Parkwick Drive Condominium Association ("Association"), appeals from judgments of the Franklin County Court of Common Pleas, which found Colony Development Corporation ("Colony") and the Association did not qualify for indemnification under policies issued to Colony by Erie Insurance Exchange ("Erie"), and any potential liability on Erie's part should be limited to $125,000.
 {¶ 2} According to stipulated facts, The Ravines at Parkwick Drive ("Ravines"), which is located in Columbus, Ohio, is a 64-unit condominium development, consisting of 16 buildings, each divided into four residential units. Colony was the developer and general contractor of the Ravines and originally owned the property upon which the condominium complex is located.
 {¶ 3} In approximately August 1994, site preparation and excavation commenced at the site of the condominium complex. As residential units were finished and sales transactions completed, the condominium units were transferred to residential owners.[1] Construction of units continued through 1995 and 1996. In March 1997, Colony conveyed title to the last residential unit. During the early stages of construction, problems arose in several areas: foundation walls, roof trusses, sidewalks, decks, firewalls, landscaping, and drainage.[2]
 {¶ 4} Throughout the construction of the Ravines, Colony subcontracted various tasks, including architectural design, civil engineering, soils engineering, surveying, site preparation, excavation, masonry, framing, and installation of footings. Colony's employees did not perform any of the construction of the condominium development; however, Colony employees did perform certain punch-list type repairs as units were completed and occupied. As the general contractor, Colony was responsible for overall coordination, supervision, inspection, and approval of subcontractors and subcontractors' work.
 {¶ 5} On May 30, 1997, in common pleas case No. 97CVH-05-5759 (appellate case No. 02AP-1088), the Association sued Colony, alleging negligence, breach of express warranty, breach of contract, strict liability, fraudulent concealment, violations of R.C. 5311.26, and violations of Ohio Consumer Sales Practices Act, R.C. 1345.01, et seq.
 {¶ 6} Colony, an insured under comprehensive commercial general liability ("CGL") policies issued by Erie,[3] notified Erie of the Association's suit and requested defense and indemnification.
 {¶ 7} On September 27, 1997, in common pleas case No. 97CVH-09-8739 (appellate case No. 02AP-1087), Erie brought a declaratory judgment action, seeking a determination about its duty to defend or indemnify Colony. Colony counterclaimed, claiming Erie had a duty to defend and indemnify Colony. On October 29, 1997, the Association moved to consolidate Erie's declaratory judgment action and the Association's action; the trial court granted the Association's motion to consolidate.
 {¶ 8} On January 16, 1998, pursuant to Civ.R. 15, the Association moved to amend its complaint by joining individual condominium owners as additional plaintiffs along with their claims. The trial court granted the Association's motion to amend its complaint; on March 17, 1998, in an agreed entry, individual condominium owners were joined as additional defendants in Erie's declaratory judgment action. On October 9, 1998, the trial court granted leave for a second amended complaint to be filed by the Association.
 {¶ 9} On March 2, 1998, Colony filed a third-party complaint against its subcontractors, generally alleging claims of negligence and, in the alternative, breach of contract. Colony later dismissed without prejudice three third-party defendants: Northwest Conduit, Inc., Midwest Concrete, Inc., and Thomas Hughes, d.b.a. Hughes Engineering. Additionally, upon motion of one of the subcontractors, the trial court bifurcated the trial with respect to the third-party defendants.
 {¶ 10} On March 23, 1998, Erie moved for summary judgment. On February 23, 1999, finding Erie did not have a duty to defend or indemnify Colony under the policy, the trial court granted summary judgment in favor of Erie.
 {¶ 11} Both the Association and Colony timely appealed the judgment to this court. See Erie Ins. Exchange v. Colony Dev. Corp. (1999),136 Ohio App.3d 406 ("Erie I"). Finding Erie had an obligation to defend Colony in the underlying action, the Erie I court reversed the trial court and remanded the cause.
 {¶ 12} Following Erie I, Erie moved this court to certify Erie I to the Ohio Supreme Court as being in conflict with judgments of other state appellate courts; in Erie Ins. Exchange v. Colony Dev. Corp. (Feb. 15, 2000), Franklin App. No. 99AP-329 ("Erie II"), this court denied Erie's motion. Subsequent to Erie I, Erie also moved this court to reconsider its decision in Erie I; in Erie Ins. Exchange v. Colony Dev. Corp.
(2000), 136 Ohio App.3d 419, appeal not allowed, 88 Ohio St.3d 1502
("Erie III"), this court denied Erie's motion for reconsideration.
 {¶ 13} While this court considered the cause presented in Erie I,
the Association and Colony entered into a settlement agreement pertaining to the Association's suit against Colony. According to the agreement, which the trial court approved,[4] Colony agreed to execute judgment in the amount of $775,933 in favor of the Association. Colony also agreed to pay $125,000 of the judgment.[5] In exchange, the Association agreed not to enforce the balance of the judgment against Colony. This consent judgment did not contain findings about the merits of the Association's claims or whether these claims were covered under Colony's insurance with Erie.
 {¶ 14} Following remand, the Association argued that, pursuant toErie I, Erie had both a duty to defend and a duty to indemnify Colony. On September 14, 2000, construing Erie I, the trial court issued a decision that found Erie had both a duty to defend and a duty to indemnify Colony. The trial court further determined that, pursuant to R.C. 3929.06, the Association was entitled to have insurance proceeds applied to satisfy the judgment.
 {¶ 15} On September 22, 2000, Erie moved the trial court to clarify its September 14, 2000, decision. In this motion, Erie contended the trial court's September 14, 2000, ruling, in effect, required Erie to pay more than $125,000, the amount Colony paid under the settlement agreement, thereby contravening this court's decision in Columbus v.Alden E. Stilson Assoc. (1993), 90 Ohio App.3d 608, motion to certify overruled (1994), 68 Ohio St.3d 1461. Without ruling upon Erie's motion to clarify, on October 24, 2000, the trial court entered judgment against Erie.
 {¶ 16} From this October 24, 2000, judgment, Erie appealed, asserting as error: (1) the trial court misinterpreted and misappliedErie I; and (2) the trial court erred in requiring Erie to indemnify Colony for an amount that exceeded the amount for which Colony was legally responsible in contravention of Stilson, supra. See Erie Ins.Exchange v. Colony Dev. Corp. (June 12, 2001), Franklin App. No. 00AP-1334 ("Erie IV").
 {¶ 17} In Erie IV, clarifying the holding of Erie I, this court stated that Erie I required Erie to defend Colony but it did not determine whether Erie had a duty to indemnify Colony. The Erie IV court noted that "[o]ur intent in Erie I was for the issue of coverage to be litigated on remand It was not. Therefore, Erie must be given an opportunity to present its argument and evidence on this issue." Id. As a result, the Erie IV court sustained Erie's first assignment of error.
 {¶ 18} Because Erie's second assignment of error in Erie IV might have been rendered entirely moot if the trial court, upon remand, found no coverage existed, the Erie IV court declined to address Erie's second assignment of error that concerned the trial court's determination about the potential indemnification amount owed by Erie.
 {¶ 19} Accordingly, the Erie IV court reversed the trial court and remanded the cause.
 {¶ 20} Upon remand and based upon a stipulated statement of facts, on September 9, 2002, the trial court determined there was no coverage for claims asserted against the developer and rendered judgment in favor of Erie; additionally, construing Stilson, supra, the trial court found Erie's potential liability was capped at $125,000.
 {¶ 21} On October 7, 2002, the Association timely appealed from the September 9, 2002, judgments in common pleas court case No. 97CVH-05-5759 (appellate case No. 02AP-1088) and No. 97-CVH-098-8739 (appellate case No. 02AP-1087).[6]
 {¶ 22} Because issues in appellate case Nos. 02AP-1087 and 02AP-1088 were interrelated, on October 7, 2002, the Association moved this court to consolidate case No. 02AP-1087 with case No. 02AP-1088. On October 11, 2002, this court granted the Association's motion to consolidate.
 {¶ 23} In its appeal, the Association asserts two assignments of error:
 First Assignment of Error
The trial court erred in ruling in favor of Erie Insurance Exchange and against the Ravines at Parkwick Drive Condominium Association, holding that there was no insurance coverage for the property damage to Colony's work as a result of the defective work performed on behalf of Colony Development Corporation by Colony's subcontractors.
 Second Assignment of Error
The trial court erred in holding that City of Columbus v. Stilson
(Franklin Cty. 1993), 90 Ohio App.3d 608 limited insurance coverage in this case.
 {¶ 24} The Association's first assignment of error asserts the trial court erred in finding the Erie policy did not cover property damage to Colony's work. In support of its argument, the Association construes Erie I as holding that Colony's negligence in constructing and designing the condominium complex constituted an "occurrence" under the Erie policy and the "work performed exclusion" did not apply if a subcontractor performed the negligent work. Id. at 414, 416.
 {¶ 25} We do not agree with the Association's construal of this court's holding in Erie I. As stated in Erie IV, supra, "[a]lthough we were required to discuss issues regarding coverage under the insurance policy in determining whether there was a legal duty to defend, our decision [in Erie I] did not specifically address whether there was, in fact, coverage. That our holding was limited to the issue of Erie's duty to defend is apparent throughout the decision."
 {¶ 26} Accordingly, having not previously addressed whether the Erie policy required Erie to indemnify Colony, its insured, or the Association, Colony's assignee, we now consider the issue here.
 {¶ 27} As established in Dealers Dairy Products Co. v. Royal Ins.Co. (1960), 170 Ohio St. 336, "[a] policy of insurance is a contract and like any other contract is to be given a reasonable construction in conformity with the intention of the parties as gathered from the ordinary and commonly understood meaning of the language employed." Id. at paragraph one of the syllabus.
 {¶ 28} Generally, coverage under a general commercial liability policy extends to sums to which the insured shall become legally obligated to pay due to bodily injury, or property damage, caused by an occurrence to which the insurance applies. 4 Stein, Construction Law (2003), ¶ 13.02[2].
 {¶ 29} As explained in 4 Bruner O'Connor on Construction Law (2002) 126-127, Section 11:37:
The standard CGL policy contains a number of exclusions collectively referred to as the "business risk" exclusions. The wording and designation of these exclusions has changed over the years. * * *
The concept of "business risk" or the "business risk" doctrine has become a fixture of insurance coverage law. At its core, the "business risk" concept expresses a principle that general liability coverage "is designed to protect against the unpredictable, potentially unlimited liability that can result from business accidents. CGL coverage is "not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained." * * *
The "business risk" concept is expressed in a number of different ways but is always a function of the perception that an insured should not be able to look to its general liability policy to protect it against the costs of having to repair or replace its work because it was improperly performed in the first place. * * *
(Citations and footnotes omitted.)
 {¶ 30} Beginning on April 20, 1994, and annually thereafter, during the period at issue, Colony contracted with Erie for commercial general liability ("CGL") coverage. (Affidavit of Douglas O. Fox dated July 14, 1998.)
 {¶ 31} Subject to exclusions, under "Property Damage Liability — Coverage G" of "Liability Protection — Section II," Erie's policy provided:
We will pay for damages because of personal injury or property damage
for which the law holds anyone we protect responsible and which are covered by your policy. We cover only personal injury and propertydamage which occurs during the policy period. The personal injury orproperty damage must be caused by an occurrence which takes place in the covered territory.
Policy, at 17.
 {¶ 32} Under the policy, "occurrence" is defined as "an accident, including continuous or repeated exposure to the same general, harmful conditions." Policy, at 6. Additionally, "property damage" is defined as "1. physical injury to or destruction of tangible property including loss of its use; or 2. loss of use of tangible property which is not physically injured or destroyed." Id.
 {¶ 33} As stated in Acme Constr. Co., Inc. v. Continental Natl.Indemn. Co., Cuyahoga App. No. 81402, 2003-Ohio-434, appeal not allowed,99 Ohio St.3d 1413, 2003-Ohio-2454, "Ohio case law * * * overwhelmingly indicates that allegations that a contractor failed to fulfill its duties in constructing or designing that which it had constructed, constitute an `occurrence' as * * * most general commercial liability insurance policies, uniformly define that term, i.e., as an `accident.' "Id. at ¶ 11. (Footnote omitted.) See, also, Zanco, Inc. v. Michigan Mut.Ins. Co. (1984), 11 Ohio St.3d 114 (observing that a perfectly credible argument can be made that a counterclaim of a breach of duty to construct condominium complex in a workmanlike manner was within initial provisions for coverage under general liability insurance policy); Ohio Cas. Ins.Co. v. Joseph Sylvester Constr. Co. (Sept. 30, 1991), Trumbull App. No. 90-T-4439, jurisdictional motion overruled (1992), 63 Ohio St.3d 1411
(allegations of contractor's failure to properly construct a residence are sufficient to make claim arguably or potentially an "occurrence" within the policy's definition of that term). Cf. Weedo v. Stone-E-Brick
(1979), 81 N.J. 233, 240-241, 405 A.2d 788.[7]
 {¶ 34} Here, the condominium units experienced continuous or repeated exposure to the same general, harmful conditions, which resulted in physical damage to the units. See Stipulation A.3. Consequently, we find the Association's allegations reasonably fall within the policy's general liability coverage for property damage caused by an "occurrence."
 {¶ 35} Accordingly, we next turn our attention to the policy's insuring agreement and exclusionary provisions. See, e.g., 4 Bruner O'Connor, supra, at 22-23, Section 11:10 ("determining what coverage is afforded under a policy is a little bit like eating an artichoke backwards. Instead of peeling away layers to get to the heart, one starts with a description of a broad grant of coverage and then proceeds to other provisions which, more often than not, strip away coverage").
 {¶ 36} "Where a policy of insurance prepared by an insurer provides generally for a certain coverage, exclusions from such coverage must be expressly provided for or must arise by necessary implication from the words used in the policy." Butche v. Ohio Cas. Ins. Co. (1962),174 Ohio St. 144, paragraph two of the syllabus.
 {¶ 37} Furthermore, "[p]olicies of insurance, which are in language selected by the insurer and which are reasonably open to different interpretations, will be construed most favorably for the insured." Id. at paragraph three of the syllabus. "It is not the responsibility of the insured to guess whether certain occurrences will or will not be covered based on nonspecific and generic words or phrases that could be construed in a variety of ways. * * * [I]n order to defeat coverage, the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question.'" Andersen v. HighlandHouse Co. (2001), 93 Ohio St.3d 547, 549, quoting Reiter, Strasser 
Pohlman, The Pollution Exclusion Under Ohio Law: Staying the Course (1991), 59 U.Cin.L.Rev. 1165, 1179.
 {¶ 38} According to exclusion B.10., property damage liability coverage does not apply to:
[P]roperty damage to your work arising out of your work or any portion of it but only with respect to the completed operations hazard.
This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.
Policy, at 20.
 {¶ 39} Here, the policy defines "your work" as "1. work or operations performed by you or on your behalf; 2. materials, parts or equipment furnished in connection with such work or operations." Policy, at 6. The policy further provides that "[y]our work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of your work." Id. Under the policy, "property damage" is defined as "1. physical injury to or destruction of tangible property including loss of its use; or 2. loss of use of tangible property which is not physically injured or destroyed." Id.
 {¶ 40} As observed in Bruner O'Connor, supra, at 156, Section 11:46:
Given that the definition of "your work" includes not only work performed by you but "on your behalf," the "subcontractor" exception becomes very significant for certain classes of contractors, such as general contractors.
 {¶ 41} As defined in the policy:
"Completed operations hazard" includes all personal injury and propertydamage occurring away from premises you own or rent arising out of yourwork that has been completed or abandoned.
Your work will be considered completed at the earliest of the following times:
1. when all of the work called for in your contract has been completed;
2. when all of the work to be done at the site has been completed, ifyour contract calls for work at more than one site;
3. when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
Work which may need further service, maintenance, correction, repair or replacement, but which is otherwise complete, will be considered completed.
The completed operations hazard does not include personal injury orproperty damage arising out of:
1. the transportation of property, unless the personal injury orproperty damage arises out of a condition in or on a vehicle created by the loading or unloading of it;
2. the existence of tools, equipment not installed, or materials abandoned or unused.
Policy, at 4.
 {¶ 42} As stated in Bruner O'Connor, supra, at 158-159:
Application of the completed operations work exclusion in the context of a construction project often entails categorizing damages that flow from defective work into five groups: (1) the insured's work causes damage to the insured's work — to which the exclusion applies; (2) the insured's work is damaged by a subcontractor — to which the exclusion does not apply; (3) a subcontractor's work is damaged by the insured improperly performed its work — to which the exclusion does not apply; (4) a subcontractor's work damaged by improperly performed work by one or more subcontractors — to which the exclusion does not apply; and (5) damage to third-party property is caused by improperly performed work of the insured or others working on its behalf — to which the exclusion does not apply.
 {¶ 43} Here, the parties stipulated as fact that "Colony employees did not perform any of the construction" and "Colony subcontracted the various tasks (architecture, civil engineering, soils engineering, surveying, site preparation, excavation, footings, masonry, framing, etc.) involved in developing and constructing the Ravines." Stipulation I.1.
 {¶ 44} Therefore, because subcontractors damaged Colony's work for which it was the general contractor, we find that, under the policy, the "work performed" exclusion does not apply and, therefore, the exclusion does not preclude coverage.
 {¶ 45} According to exclusion B.8.e., property damage liability coverage does not apply to property damage to "that particular part of any property that must be restored, repaired or replaced because yourwork was faulty. We will cover property damage included in the productshazard and completed operations hazard. This exclusion does not apply to liability assumed under a sidetrack agreement." Policy, at 20.
 {¶ 46} As previously stated, according to the policy:
"Your work" means:
1. work or operations performed by you or on your behalf;
2. materials, parts, or equipment furnished in connection with such work or operations.
Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of your work.
Policy, at 6.
 {¶ 47} The policy further provides:
"Products hazard" includes all personal injury and property damage:
1. occurring away from premises you own or rent and arising out of yourproduct, except products that are still in your physical possession;
2. arising out of your product if your business includes the handling or distribution of your product for consumption on premises you own or rent.
Id. at 6.
 {¶ 48} Furthermore, as previously stated under the policy:
"Completed operations hazard" includes all personal injury and propertydamage occurring away from premises you own or rent arising out of yourwork that has been completed or abandoned.
Your work will be considered completed at the earliest of the following times:
1. when all of the work called for in your contract has been completed;
2. when all of the work to be done at the site has been completed, ifyour contract calls for work at more than one site;
3. when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
Work which may need further service, maintenance, correction, repair or replacement, but which is otherwise complete, will be considered completed.
The completed operations hazard does not include personal injury orproperty damage arising out of:
1. the transportation of property, unless the personal injury orproperty damage arises out of a condition in or on a vehicle created by the loading or unloading of it;
2. the existence of tools, equipment not installed, or materials abandoned or unused.
Id. at 4.
 {¶ 49} Here, according to the parties' stipulation of facts, as early as October 1994, outward and downward slope movement was observed in rear foundation walls of buildings 6, 8, 10, and 11. Stipulation B.1. This damage occurred while Colony retained an ownership interest in the foundation walls. See Stipulation A.1. ("Colony Development Corp. originally owned the property on which the development is located and was the developer/general contractor of the development"); Stipulation A.2. ("Colony conveyed title of the last unit in March 1997").
 {¶ 50} Because damage to the rear foundation walls occurred in the early stages of construction (1) while Colony retained an ownership interest in the condominium development, and (2) apparently before title to the units contained in buildings 6, 8, 10, and 11 were transferred to the residential owners, we find exclusion B.8.e. applies and, therefore, Colony, as an insured, and the Association, as Colony's assignee, are precluded from recovery under the CGL policy with respect to property damage associated with foundation walls. According to the policy, the limitation that exclusion B.8.e. does not apply to "property damage" included in the "products hazard" and "completed operations hazard," only applies to property damage "occurring away from premises you own or rent," as specified in both the "products hazard" and "completed operations hazard" definitions of the policy. Here, property damage to the foundation walls first occurred at the time Colony owned the premises and the property damage apparently persisted following conveyance of title to residential owners. See Stipulation A.3.
 {¶ 51} Similarly, to the extent that damage to the firewalls, decks, and roof trusses occurred during construction (1) while Colony retained an ownership interest in the condominium development, and (2) before titles to the individual units were transferred to residential owners, we find the "faulty work exclusion" applies and, therefore, Colony, as an insured, and the Association, as Colony's assignee, are precluded from recovery under the CGL policy with respect to property damage to the firewalls, decks, and roof trusses. See Stipulation E. ("[i]mproper installation is the likely cause of the firewall defects"); Stipulation F.2. ("Colony's subcontractors should not have proceeded with installation without adequate specifications for this area of deck support"); Stipulation F.4. ("[s]ome deck footers were not poured large enough or as deep as the plans specify"); Stipulation F.5. (Colony's subcontractors did not space deck balusters in conformity with the plans); Stipulation F.6. (Colony's subcontractors did not install 45-degree braces as required by the plans); Stipulation F.7. (required brackets not specified in deck plans; therefore plans were deficient); Stipulation F.8. (Colony's subcontractors installed doubled 2x8-inch headers instead of the doubled 2x10-inch headers required by the plans); and Stipulation G.1. (damages to roof trusses caused by Colony's subcontractors in their "storage, handling, and installation of the trusses during construction").
 {¶ 52} The Association contends a strict interpretation of the policy provision, as discussed above, renders "illusionary" [sic] the policy's coverage under the "completed operations hazard" portion of the policy.
 {¶ 53} "[A] contract is illusory only when by its terms the promisor retains an unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise and thus makes it merely illusory." Century 21 Am. Landmark, Inc. v.McIntyre (1980), 68 Ohio App.2d 126, 129-130, citing 1 Williston on Contracts (3 Ed. 1957) 140, Section 43. See, also, Inskeep v. Lewis (May 10, 1991), Trumbull App. No. 89-T-4246, quoting Andreoli v. Brown
(1972), 35 Ohio App.2d 53, 55, quoting Restatements Contracts, Section 2 (1925), paragraph (b) of the comment ("`[a]n apparent promise which according to the terms makes performance optional with the promisor * * * is in fact no promise, although is often called an illusory promise.'"). See, also, Restatement of the Law 2d, Contracts (1981) Section 2, commente.
 {¶ 54} Here, if the property damage had occurred away from Colony's premises, the policy's "faulty work" exclusion arguably might not have precluded coverage. Therefore, because the policy affords Colony, the insured, with some benefit, we do not find the policy to be illusory. See, e.g., State Auto Ins. Co. v. Golden (1998), 125 Ohio App.3d 674,678, appeal not allowed, 82 Ohio St.3d 1477, citing Royal Paper StockCo., Inc. v. Meridian Ins. Co. (1994), 94 Ohio App.3d 327, 334 (Tyack, J., concurring), dismissed, 70 Ohio St.3d 1440; Estate of Izold v.Suburban Power Piping Corp. (Mar. 20, 1997), Cuyahoga App. No. 70873, appeal not allowed, 79 Ohio St.3d 1460 ("[w]hen some benefit to the insured is evident from the face of the endorsement, the endorsement is not an illusory contract").
 {¶ 55} According to exclusion B.7., property damage liability coverage does not apply to "property damage to property anyone weprotect owns, rents or occupies. This exclusion does not apply to protection provided in What we also pay — A. Fire Legal Liability." Policy at 20.
 {¶ 56} Because damage to the rear foundation walls occurred in the early stages of construction (1) while Colony retained an ownership interest in the condominium development, and (2) neither party asserts titles to units contained in buildings 6, 8, 10, and 11 were transferred from Colony to residential owners during the early stages of construction, we find exclusion B.7. applies and, therefore, Colony, as an insured, and the Association, as Colony's assignee, are precluded from recovery under the CGL policy with respect to property damage associated with foundation walls.
 {¶ 57} Similarly, to the extent that damage to the firewalls, decks, and roof trusses occurred during construction (1) while Colony retained an ownership interest in the condominium development, and (2) before titles to the individual units were transferred to residential owners, we find exclusion B.7. applies and, therefore, Colony, as an insured, and the Association, as Colony's assignee, are precluded from recovery under the CGL policy with respect to property damage to the firewalls, decks, and roof trusses.
 {¶ 58} According to exclusion A.7.e., property damage liability coverage does not apply to damages due to "any service of a professional nature, including but not limited to: 1) the preparation or approval of maps, plans, opinions, reports, surveys, designs or specifications, and 2) supervisory, inspection or engineering services." Policy, at 19.
 {¶ 59} Here, the parties stipulated as fact that Colony, as the general contractor, "was responsible for overall coordination, supervision, inspection, and approval of the subcontractors and their work." Stipulation I.1. The parties further stipulated that Craig W. Murdick was the architect for the condominium complex. Stipulation K.
 {¶ 60} Although Colony did not prepare the plans, surveys, designs, or specifications for the condominium complex, Colony, as the general contractor, was "responsible" for the "inspection, and approval" of the subcontractor-architect and the subcontractor-architect's work. See Stipulation I.1. As observed in Drs. Harold Jack Kahn, O.D.,Inc. v. Cincinnati Ins. Co. (Feb. 3, 1984), Lucas App. No. L-83-309, quoting Aker v. Sabatier (La.App. 1967), 200 So.2d 94, 97, "`Professional services, in its usual connotation, means services performed by one in the ordinary course of the practice of his profession, on behalf of another, pursuant to some agreement, express or implied, and for which it could reasonably be expected some compensation would be due.'" {¶61} Therefore, to the extent that coordination, supervision, inspection, and approval of subcontractors and subcontractors' work is a service Colony performed in the ordinary course of its profession as a general contractor and because the "professional services" exclusion precludes coverage to "any service of a professional nature, including * * * the preparation or approval of maps, plans, opinions, reports, surveys, designs or specifications, and * * * supervisory, inspection or engineering services[,]" we find the "professional services" exclusion precludes Colony, as an insured, and the Association, as Colony's assignee, from recovering under the Erie policy. But, see, GRE Ins. Groupv. Normandy Pointe Assoc. (Mar. 8, 2002), Montgomery App. No. 18998 (finding "professional services" exclusion did not apply to a general partnership engaged in the business of developing and marketing home sites who contracted with consultant to provide engineering services). Cf. ErieI, at 417 (observing in dictum that "professional services" exclusion "does not apply to those damages resulting from Colony's construction activities, including those performed on its behalf by subcontractors. Construction activities are not professional services").[8]
 {¶ 62} The Association, however, asserts the "professional service" exclusion is ambiguous as to whether the exclusion applies to Colony's own rendering of professional services or whether it applies to the subcontractors' rendering of professional services on Colony's behalf. Given this purported ambiguity and arguing Colony's activities were not "professional services," the Association asserts this provision should be construed in Colony's and the Association's favor. See Butche, supra, at paragraph three of the syllabus.
 {¶ 63} As stated by this court in Ald Concrete Grading Co.,Inc. v. Chem-Masters Corp. (1996), 111 Ohio App.3d 759, 765-766, appeal not allowed, 77 Ohio St.3d 1492:
It is well settled in Ohio that identical standards of interpretation will be applied to insurance contracts as will be applied to other written contracts. * * * "The fundamental goal in insurance policy interpretation is to ascertain the intent of the parties from a reading of the contract in its entirety, and to settle upon a reasonable interpretation of any disputed terms in a manner calculated to give the agreement its intended effect." * * * The language in an insurance policy must be given its plain and ordinary meaning, and only where a contract of insurance is ambiguous and susceptible of more than one interpretation must the policy language be liberally construed in favor of the insured or claimant seeking coverage. * * * The general rule of liberal construction of policies in favor of the insured cannot be employed to create an ambiguity where none exists. * * * Interpretation of a clear and unambiguous insurance contract is a matter of law, subject to denovo review by an appellate court. * * *
(Citations omitted.) See, also, Westfield Ins. Co. v. Galatis,100 Ohio St.3d 216, 2003-Ohio-5849, at ¶ 14, reconsideration denied, ___ Ohio St.3d ___, 2003-Ohio-6879, quoting Morfoot v. Stake (1963),174 Ohio St. 506, paragraph one of the syllabus ("`[a]lthough, as a rule, a policy of insurance that is reasonably open to different interpretations will be construed most favorably for the insured, that rule will not be applied so as to provide an unreasonable interpretation of the words of the policy'").
 {¶ 64} Based on our review of the plain and ordinary meaning of the policy's "professional services" exclusion, we find the "professional services" exclusion is clear and unambiguous. Therefore, notwithstanding the Association's contention, as a matter of law, we do not find the policy's "professional services" exclusion is ambiguous. See Galatis, at ¶ 11, citing Gulf Ins. Co. v. Burns Motors, Inc. (Tex. 2000),22 S.W.3d 417, 423. Furthermore, we do not agree with the Association's contention that Colony's activities did not constitute "professional services" under the plain and ordinary meaning of the term.
 {¶ 65} According to exclusion B.11., property damage liability coverage does not apply to:
[p]roperty damage to impaired property or tangible property not physically injured or destroyed, resulting from:
a. delay in or lack of performance on a contract or agreement by or foryou; or
b. a defect, deficiency, inadequacy or dangerous condition in yourproduct or your work.
 We will pay for loss of use of impaired property or other tangible property resulting from sudden and accidental physical damage to yourproduct or your work after it has been put to its intended use.
Policy, at 20.
 {¶ 66} According to the policy:
"Your work" means:
1. work or operations performed by you or on your behalf;
2. materials, parts, or equipment furnished in connection with such work or operations.
Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of your work.
Id. at 6.
 {¶ 67} Furthermore "impaired property" is defined as:
"Impaired property" means tangible property, other than your product
or your work, that cannot be used or is less useful because:
1. the impaired property incorporates your product or your work that is known or thought to be defective, deficient, inadequate or dangerous; or
2. you have failed to fulfill the terms of the contract or agreement;
if such property can be restored to use by:
1. repairing, replacing, adjusting or removing your product or yourwork; or
2. your fulfilling the terms of the contract or agreement.
Id. at 4.
 {¶ 68} Here, according to the Association, architectural plans specified that sidewalks slopes should comply with guidelines under the Americans With Disabilities Act ("ADA"). Stipulation C.1. However, some sidewalks were improperly sloped when subcontractors originally poured the concrete. Consequently, some sidewalk slopes do not comply with ADA guidelines and require replacement. Stipulation C.1. See, generally, Americans With Disabilities Act of 1990, Section 12101, Title 42, U.S. Code, et seq.
 {¶ 69} Under these circumstances, because the defect, deficiency, inadequacy, or dangerous condition in the improperly sloped sidewalks was the result of work performed on Colony's behalf by subcontractors, we find the "tangible property" exclusion properly applies to this condition and precludes coverage.
 {¶ 70} Similarly, because the defect, deficiency, inadequacy, or dangerous condition related to defective drainage conditions, which was caused by improperly positioned downspouts, and erosion, which was caused by improper grading, was the result of work performed on Colony's behalf by subcontractors, we find the "tangible property" exclusion properly applies to these conditions. See Stipulations D.1. and 2.
 {¶ 71} Because subcontractors damaged the roof trusses during storage, handling, and installation, in its defense Erie asserts damage to the roof trusses is therefore excluded by the policy's "operations" exclusion. See Stipulation G.1. (stating that "[t]he roof trusses * * * were split, warped, bent, broken and pulled apart. In some cases the roof trusses were partially cut or sawed through. * * * These damages were caused by Colony's subcontractors in their storage, handling, and installation of the trusses during construction").
 {¶ 72} According to exclusion B.8.d., the "operations" exclusion, property damage liability coverage does not apply to property damage to:
that particular part of real property upon which operations are being performed by you or any contractor or subcontractor working directly or indirectly on your behalf, if the property damage arises out of those operations[.]
 {¶ 73} Relying on Spears v. Smith (1996), 117 Ohio App.3d 262, the Association argues the "operations" exclusion does not preclude coverage. In Spears, construing a similarly worded provision,[9] the court determined this exclusion applied to "work in progress." Id. at 266. The Spears court, quoting with approval Franco, Insurance Coverage for Faulty Workmanship Claims Under Commercial General Liability Policies (1995), 30 Tort Ins.L.J. 785, 796, observed that the intent of this exclusion was "`to bar coverage for the work being done by a contractor when claims arise at the time the work is being performed. This bar exists irrespective of whether the claim is being made against the contractor performing the work or the upstream contractor supervising the work.'" Id. Therefore, because the Association's claims were brought after Colony's work was completed, the Association reasons this exclusion does not preclude coverage.
 {¶ 74} Because the trial court did not rely upon the "operations" exclusion when it rendered judgment and because other exclusions, as discussed above, preclude coverage, we decline to consider Erie's argument here. See, e.g., Crestmont Cleveland Partnership v. Ohio Dept.of Health (2000), 139 Ohio App.3d 928, 935, appeal not allowed (2001),91 Ohio St.3d 1419, citing State ex rel. Pitz v. Columbus (1988),56 Ohio App.3d 37, 45 ("it is well established that a reviewing court will not ordinarily address issues that were not tried by the trial court").
 {¶ 75} In summary, although the "work performed" exclusion does not preclude coverage, other exclusionary provisions do preclude coverage. Therefore, because none of the damage to the Ravines is covered under the CGL policy issued to Colony by Erie, we therefore overrule the Association's first assignment error.
 {¶ 76} Because Colony, as an insured, and the Association, as Colony's assignee, are not entitled to insurance coverage under the policy issued by Erie, we find the Association's second assignment of error, which concerns the trial court's application of Stilson, supra, is of no practical significance and is therefore moot, and we do not consider it here. See App.R. 12(A)(1)(c).
 {¶ 77} Accordingly, having overruled the Association's first assignment of error and having found the Association's second assignment of error is moot, we therefore affirm the judgments of the Franklin County Court of Common Pleas.
Judgments affirmed.
Sadler and Deshler, JJ., concur.
Deshler, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] See, also, "Declaration and Bylaws Creating and Establishing a Plan For Condominium Ownership Under Chapter 5311 of the Revised Code of Ohio For The Ravines at Parkwick Drive Condominium" filed January 18, 1995. According to Recital A., "Colony Development Corporation, an Ohio corporation * * * [was] the owner in fee simple of all of the real property hereinafter described and the improvements thereon and appurtenances thereto."
[2] Stipulation A.3. states: "In the early stages of construction, problems were observed in a number of buildings. The rear foundation walls were rotating outward (in a downslope direction), opening gaps between the walls and the basement floor slabs. Other problems were noted in the front basement walls, including bowing and cracking of the walls. There was also evidence of settling in some of the basement areas. Problems were also noted with the roof trusses, sidewalks, decks, firewalls, landscaping and drainage conditions."
[3] Beginning on April 20, 1994, and annually thereafter, during the period at issue, Colony contracted with Erie for general commercial liability coverage.
[4] In a judgment entry filed November 29, 1999, in common pleas case No. 97CVC-05-5759, the trial court determined: "The claims of Plaintiff, The Ravines at Parkwick Drive Condominium Association, against Defendant, Colony Development Corporation, came before the Court * * * and pursuant to agreement between the parties, the essential terms of which were disclosed to the court and dictated in the record in open court in the presence of representatives of the parties, the following judgment is entered.
"IT IS ORDERED AND ADJUDGED that the Plaintiff, The Ravines at Parkwick Drive Condominium Association, shall recover from Defendant, Colony Development Corporation, the sum of $775,933.00, with interest thereon, at the rate provided by law, and their costs of action."
[5] Colony paid $125,000 to the Association from proceeds obtained from U.S. Housing Components, Inc., the supplier of the roof trusses that were used in the construction of the condominium complex. In consideration of this payment, the Association agreed to assert no claims against U.S. Housing Components, Inc.
[6] In the present appeal, The Ravines at Parkwick Drive Condominium Association is the sole appellant. Individual condominium owners, although added as named parties in the common pleas court actions, are not appellants in the present appeal.
[7] In Weedo, discussing the boundary between "business risks" and "occurrences" under a commercial general liability policy, the New Jersey Supreme Court observed: "When a craftsman applies stucco to an exterior wall of a home in a faulty manner and discoloration, peeling and chipping result, the poorly-performed work will perforce have to be replaced or repaired by the tradesman or surety. On the other hand, should the stucco peel and fall from the wall, and thereby cause injury to the homeowner or his neighbor standing below or to a passing automobile, an occurrence of harm arises which is the proper subject of risk-sharing as provided by the type of policy before us in this case. The happenstance and extent of the latter liability is entirely unpredictable the neighbor could suffer a scratched arm or a fatal blow to the skull from the peeling stonework. Whether the liability of the businessman is predicated upon warranty theory or, preferably and more accurately, upon tort concepts, injury to persons and damage to other property constitute the risks intended to be covered under the CGL." Id. at 240-241.
[8] We also observe Erie I was decided prior to the filing of the Association's and Erie's "Stipulated Statement of Facts" that states "Colony was responsible for overall coordination, supervision, inspection, and approval of the subcontractors and their work." Stipulation I.1.
[9] In Spears, supra, at 264, coverage was excluded to "property damage" to: "That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the `property damage' arises out of those operations * * *."