*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0068P (6th Cir.)
File Name: 04a0068p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

STANDARD CONSTRUCTION
CO., INC.,
     *Plaintiff-Appellee,*

     *v.*

MARYLAND CASUALTY CO.
and NORTHERN INSURANCE
CO. OF NEW YORK,
     *Defendants-Appellants.*

No. 02-6039

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 01-02006—Diane K. Vescovo, Magistrate Judge.

Argued: December 11, 2003

Decided and Filed: March 4, 2004

Before: ROGERS and COOK, Circuit Judges;
BERTELSMAN, District Judge.[*]

_____

[*] The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

_____

## COUNSEL

**ARGUED:** J. Robert Hall, MECKLER, BULGER & TILSON, Chicago, Illinois, for Appellants. J. Brooke Lathram, BURCH, PORTER & JOHNSON, Memphis, Tennessee, for Appellee. **ON BRIEF:** J. Robert Hall, Michael M. Marick, MECKLER, BULGER & TILSON, Chicago, Illinois, for Appellants. J. Brooke Lathram, BURCH, PORTER & JOHNSON, Memphis, Tennessee, for Appellee.

BERTELSMAN, D. J., delivered the opinion of the court, in which COOK, J., joined. ROGERS, J. (pp. 16-17), delivered a separate concurring opinion.

_____

## OPINION

_____

BERTELSMAN, District Judge. Defendants, Maryland Casualty Company and Northern Insurance Company of New York, appeal the district court's judgment in favor of plaintiff, Standard Construction Company. The district court ruled that defendants owed plaintiff both a duty to defend and a duty to indemnify under certain commercial general liability insurance policies. For the reasons set forth, we AFFIRM the district court's judgment.

### *Factual Background*

Standard Construction Company is an asphalt paving contractor. Maryland Casualty Company and Northern Insurance Company of New York insured Standard from January 1, 1990 through January 1, 1993, under three

successive one-year commercial general liability ("CGL") and umbrella policies, respectively.

In March 1990, Standard entered into a contract with the State of Tennessee to perform paving and road work as part of a road-widening project on Highway 64 near Arlington, Tennessee. Under the contract, Standard was responsible for the clearing and removal of certain debris, to be performed in accord with specifications issued by the Tennessee Department of Transportation. These specifications required Standard to remove debris from the construction area; to take ownership of the debris and dispose of it elsewhere; to secure written permission from landowners prior to dumping the debris on any private property; and to make reparations for any damage to private or public property that might occur during disposal.

Standard subcontracted this disposal work to Ronald S. Terry Construction Company. Terry's superintendent, Gene A. Bobo, obtained written permission from six owners of the property adjacent to Highway 64 to dump on their property construction debris from the road-widening project. With respect to a seventh property owner, the then 90-year old Cassella Love, Bobo obtained a similar agreement signed by Love's daughter, Louise Poole, in Love's name.

Terry, believing that it had Love's permission, proceeded to dump construction debris, including trees, corrugated metal pipes, concrete chunks with exposed steel, and asphalt, on Love's property. At that time, Love's property, which was zoned commercial, was the subject of condemnation proceedings brought by the State in connection with the widening project. William H. Fisher, an attorney representing Love in the condemnation action, retained an engineer to inspect Love's property. The engineer opined that the debris dumped on Love's property rendered the land unsuitable for development.

After receiving the engineer's report, Fisher wrote to Standard by letter, dated May 22, 1992, demanding that the company cease dumping on Love's property, revoking any authority Standard may have had for such dumping, and requesting that Standard remove the debris. Fisher also stated that Love suffered from senile dementia and that her ability to enter into a binding contract was questionable.

After attempting unsuccessfully to locate a copy of the first Love agreement, Standard obtained a second dumping agreement, signed either by Love or by Poole in Love's name, dated June 17, 1992. Handwritten on the agreement was the notation: "agree to asp[halt] driveway + dump 2 loads of dirt in front yard." Thereafter, Standard paved Love's driveway and spread dirt on her land.

On November 22, 1994, Love, by and through her daughter, filed suit in Tennessee state court against Standard, Terry, Bobo and the State of Tennessee. Love asserted various claims for damage to her property, including a claim for trespass. Standard tendered defense of the *Love* case to Maryland and Northern, but the insurers denied coverage on several different grounds. Following amendments to the *Love* complaint, the insurers again refused to defend Standard. Standard eventually settled the *Love* matter for approximately $200,000.

On January 5, 2001, Standard filed the instant declaratory judgment action alleging that the insurers breached their duties to defend and indemnify Standard in connection with the *Love* lawsuit. The parties consented to the jurisdiction of United States Magistrate Judge Diane K. Vescovo, pursuant to 28 U.S.C. § 636(c).

After discovery, the parties filed cross-motions for summary judgment. By order, dated May 15, 2002, Magistrate Judge Vescovo granted summary judgment in Standard's favor as to the duty to defend, ruling that property

damage resulting from trespass would constitute a covered claim under the applicable policies and that certain "business risk" exclusions relied upon by the insurers were inapplicable to claims by a stranger to the construction contract for damages resulting from a trespass. Magistrate Judge Vescovo denied the motions as to the duty to indemnify, however, finding that there were genuine disputes of material fact as to whether a contract was entered into between Love and Standard (through Terry) so as to trigger the business risk exclusions.

Magistrate Judge Vescovo conducted a bench trial on June 17 and 18, 2002, after which she entered Findings of Fact, Conclusions of Law, and a Judgment in Standard's favor. Specifically, Magistrate Judge Vescovo found that Terry's disposal of construction debris on Love's property constituted a trespass because, although Terry (and Standard) believed it had Love's permission to dump the debris, in reality such consent was lacking because Love herself was incompetent to enter into any agreement and because her daughter, Poole, had neither actual nor implied authority to do so on Love's behalf. Thus, no contract between Love and Standard ever existed, and Terry's dumping on the property was wrongful.

Magistrate Judge Vescovo also concluded that Standard had acted reasonably in settling the *Love* case and that Standard had not impaired the insurers' subrogation rights.

The trial court awarded Standard $244,750 for its *Love* defense costs; $200,000 for its settlement costs; and $6,487.30 in pre-judgment interest.

The insurers now appeal the grant of partial summary judgment to Standard on the issue of the duty to defend, the denial of summary judgment on that issue to the insurers, and the judgment in favor of Standard on the duty of indemnification.

### *Analysis*

#### A.  Standard of Review

We review the district court's grant of summary judgment *de novo*, employing the same legal standard applied by the district court. *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003) (citation omitted). The same standard applies where the district court denies summary judgment based upon purely legal grounds. *Id.* The district court's findings of fact are reviewed under the clearly erroneous standard. *See* Fed. R. Civ. P. 52(a).

#### B.  Applicable Law

The district court held that Tennessee law was applicable, and neither party contests this ruling. Throughout the opinion and briefs, however, citations are made to authorities of many jurisdictions, since the policy provisions and cases interpreting them are reasonably uniform. We agree with this approach.

#### C.  Scope of Coverage

#### 1.  "Occurrence"

The insuring agreement of these policies[1] states, in pertinent part:

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. . . .

---

[1]The relevant terms in the Maryland and Northern policies are identical.

b.  This insurance applies to "bodily injury" and "property damage" only if:

   (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;" and

   (2) The "bodily injury" or "property damage" occurs during the policy period.

The policies further define "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." The term "accident," however, is not defined. In addition, the policy excludes from coverage "bodily injury" or "property damage" that is "expected or intended from the standpoint of the insured."

Appellants argue that there was no coverage under the policies because Standard intended to dump the debris on Love's land. This situation, it asserts, does not fit the policy's definition of an "occurrence."

The district court held that the dumping was an "occurrence" or "accident" within the meaning of the policy because, while the dumping was intentional, the fact that it was done without permission, thus making it wrongful, was not intended by the insured.

We agree with this conclusion. As pointed out by the trial court, "if the resulting damages are unintended, the resulting damage is accidental even though the original acts were intentional." (J.A. at 169) (Order) (quoting *State Farm Fire and Cas. Co. v. CTC Development Corp.*, 720 So.2d 1072, 1075 (Fla. 1998)).

A Supreme Court of Tennessee opinion relied upon by the trial court is instructive. In *Tennessee Farmers Mut. Ins. Co.*

*v. Evans*, 814 S.W.2d 49 (Tenn. 1991), the court, after noting several approaches to this issue by various courts, held:

After carefully weighing the implications of the several approaches discussed in the preceding paragraphs, this Court is persuaded that the best approach, and the one that should be adopted in Tennessee, is that followed by a majority of the states that have had an opportunity to construe the language involved in this case. That is, in order to find that an intended or expected acts exclusion applies, it must be established that the insured intended the act *and* also intended or expected that injury would result. These are separate and distinct inquiries because many intentional acts produce unexpected results and comprehensive liability insurance would be somewhat pointless if protection were precluded if, for example, the intent to cause harm was not an essential (and required) showing. . . . The intent itself may be actual or inferred from the nature of the act and the accompanying reasonable foreseeability of harm. It is immaterial that the actual harm was of a different character or magnitude or nature than that intended.

*Id.* at 55-56 (citation omitted) (italics in original).

We reject appellants' argument that *Evans* is "irrelevant" because the court there was construing an exclusion rather than a coverage term. As the trial court here noted, the "expected or intended" language of the exclusion discussed in *Evans* was historically part of the definition of "occurrence." Moreover, whether expressed as part of the definition of "occurrence" or stated as a separate exclusion, the point is the same.

Moreover, this court recently reached a similar conclusion in a case where it had occasion to comment at length on the meaning of "occurrence/accident" in liability policies. *See Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503 (6th Cir.

2003) (applying Kentucky law). There, the insured, a carpet-cleaning company, hired an individual as a carpet cleaner, but it negligently failed to perform a background check on him. *Id.* at 505. The individual subsequently gained entrance to a customer's home to clean her carpet and, using knowledge of the premises gained in that endeavor, later broke into the home and murdered the homeowner. *Id.* The homeowner's estate sued the insured carpet-cleaning company.

The insurance company argued that this scenario did not constitute an "occurrence" under the policy because both the hiring and murder were intentional. The policy at issue defined "occurrence" exactly as the policies do here: as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.*

This court rejected the insurance company's argument. First, we held that the term "accident" was not ambiguous, observing that the ordinary meaning of that term is "an event which . . . is unusual and not expected by the person to whom it happens." *Id.* at 507 (quoting Black's Law Dictionary (5th ed. 1979)). Further, we noted that an "accident is generally understood as an unfortunate consequence which befalls an actor through his inattention, carelessness or perhaps for no explicable reason at all." *Id.* (quoting *Fryman v. Pilot Life Ins. Co.*, 704 S.W.2d 205, 206 (Ky. 1986)). "The result is not a product of desire and is perforce accidental." *Id.*

In *Westfield*, the insured deliberately hired a person, but that act had unforseen and unintended consequences due to the insured's negligence, thus bringing the event within the definition of "occurrence" for purposes of its liability insurance.

In the instant case, the insured deliberately dumped debris on Love's property, but that act too had unforeseen and unintended consequences due to the insured's negligence in failing to secure a valid agreement from the property's owner.

We thus agree with the trial court that, as a matter of law, the act falls within the definition of "occurrence."

### 2.  "Property Damage"/The "Your Work" Exclusion

Appellants also assign as error the district court's holding that the underlying *Love* action sought recovery for "property damage" under these liability policies. As defined in the policies, "property damage" means:

a.  Physical injury to tangible property, including all resulting loss of use of the property; or
b.  Loss of use of tangible property that is not physically injured.

The policies exclude coverage, however, for "property damage" to "impaired property" arising out of a "defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work.'"

Appellants' contention, as we understand it, is that because Standard was performing work pursuant to a contract with the State, the tort it committed against Love - - a stranger to that contract - - is not covered either because it was caused merely by faulty workmanship and/or because the injury arose out of Standard's "work."

We agree with the district court's resolution of this issue. The trial court reasoned that, since Love was a third person, not a party to Standard's contract with the State, the damage to her property from the wrongful dumping was not subject to the exclusion for "your [the insured's] work."

This principle was derived from the decision of the Supreme Court of Tennessee in *Vernon Williams & Son Constr., Inc. v. Continental Ins. Co.*, 591 S.W.2d 760 (Tenn. 1979). There, speaking of this type of coverage, the court pointed out: "The coverage is for tort liability *for physical*

*damages to others and not for contractual liability of the insured* for economic loss because the product or completed work is not that *for which the damaged person bargained*." *Id.* at 764  (citation omitted) (emphasis added).

Further, "it clearly appears that *property damage claims of third persons* resulting from the insured's breach of an implied warranty are covered unless the claimed loss is confined to the insured's work or work product."  *Id.* (emphasis added).

In the instant case, it is not the *manner* in which the dumping was performed (the "work") that is faulty or caused damage, but rather that the dumping itself at the location in question was unauthorized.  Some damage to Love's land inevitably resulted.  The damage was to the land, not to the insured's "work."  Therefore, there is coverage for "property damage" and the "your work" exclusion does not apply. *Accord Standard Fire Ins. Co. v. Chester-O'Donley & Assoc., Inc.*, 972 S.W.2d 1, 10 (Tenn. App. 1998) ("The exclusion does not apply if there is damage to property other than the insured's work.") (discussing extensively the history of this policy language and many other cases and texts); *Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788, 791-95 (N.J. 1979) (extensive discussion).[2]

### 3.    Exclusion 2j(5)

Appellants also assign as error the district court's conclusion that the exclusion found in section 2j(5) of the policy does not apply to Standard's claim.  This exclusion precludes coverage for property damage to:

---

[2]The discussion of the general principle underlying business risk exclusions, *infra*, is also pertinent to this subsection.

That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations.

As previously noted, at the conclusion of the indemnification trial, the district court found as a fact that there was no permission by Love for Terry to dump debris on her land, and that Standard thus had no contract with her. Therefore, it held that the dumping was a trespass.  This finding is not clearly erroneous.

The district court further held that Exclusion j(5) was not applicable, since it was not intended to apply to claims by third parties, but only to claims by the entity with which the insured construction contractor had expressly contracted. (J.A. at 19-22) (Findings of Fact and Conclusions of Law). Thus, the district court further held that whether Love was a third-party beneficiary of Standard's construction contract with the State was immaterial.

We agree with these conclusions.  Appellants cite *Vinsant Elec. Contractors v. Aetna Cas. & Surety Co.*, 530 S.W.2d 76 (Tenn. 1975), and *Standard Fire Ins. Co. v. Chester-O'Donley & Assoc., Inc.*, 972 S.W.2d 1 (Tenn. App. 1998). Neither of these cases, however, is of help to the insurers because neither involved a third party.  Rather, both were actions by the owner with whom the insured construction company had contracted.

The Tennessee court describes general liability policies as follows:

General liability policies are not "all-risk" policies. . . . They provide an insured with indemnification for damages up to policy limits for which the insured becomes liable *as a result of tort liability to a third party*. . . .   The risk insured by these policies is the

possibility that the insured's product or work will cause bodily injury or *damage to property other than the work itself* for which the insured may be found liable.

*Standard Fire*, 972 S.W.2d at 6-7 (citations omitted) (emphasis added).

The *Standard Fire* court further cites with approval an article by Peter J. Neeson and Phillip J. Meyer entitled "The Comprehensive General Liability Policy and Its Business Risk Exclusions: An Overview." *Id.* at 7 n. 8. There, the learned authors state:

The Business Risk exclusions do not purport to bar coverage for personal injuries or for physical injury to other property which are caused by the insured's product or work.

Peter J. Neeson & Phillip J. Meyer, *The Comprehensive General Liability Policy and Its Business Risk Exclusions: An Overview*, 79-80, reprinted in *Reference Handbook on the Comprehensive General Liability Policy* (American Bar Ass'n 1995).

We agree with these observations and also with the authors' application of these principles to construction projects:

In every construction project, the owner and contractor incur risks or exposure to loss. Some of these risks can be shifted to insurers -- others cannot. The owner has the risk that the contractor will fail to properly perform his contractual obligations. This risk can be shifted by the owner either securing, or requiring the contractor to provide, a performance bond. The owner likewise has the risk the project may be destroyed by fire, explosion or the like during construction. The contractor may have a similar risk. Either or both may shift that risk to an insurer by acquiring a builder's risk policy. Again, such

losses are generally beyond the effective control of either the contractor or owner . . . *[The] risk of third party personal injury or property damage claim[s] due to defective workmanship or materials may be shifted by the contractor purchasing a comprehensive general liability insurance policy. . . .* However, in addition to and apart from those risks, the contractor likewise has a contractual business risk that he may be liable to the owner resulting from failure to properly complete the building project itself in a manner so as to not cause damage to it. This risk is one the general contractor effectively controls and one which the insurer does not assume because it has no effective control over those risks and cannot establish predictable and affordable insurance rates.

*Id.* at 81-82 (quoting *Knutson Constr. Co. v. St. Paul Fire and Marine Ins. Co.*, 396 N.W.2d 229, 234 (Minn. 1986)) (emphasis added).

Thus:

When read together, these [business risk] provisions exclude coverage when there has been *no physical injury to tangible property other than the insured's work*.

*Standard Fire*, 972 S.W.2d at 12 (emphasis added).

In other words, there *is* coverage where there has been physical injury to tangible property that is not the insured's work. As we have pointed out earlier in this opinion, we agree with the district court's view that Love's tangible real property is not the insured's "work," and that it was physically damaged by having the construction debris from the road-widening project dumped on it. Therefore, this exclusion does not apply. *See Thommes v. Milwaukee Mut. Ins. Co.*, 622 N.W.2d 155, 159-60 (Minn. App. 2001) (holding that j(5) exclusion did not bar coverage for claim against insured by third party arising out of insured's damage

to third party's property), *aff'd*, 641 N.W.2d 877 (Minn. 2002). *Cf. Dewitt Constr. Inc. v. Charter Oak Fire Ins. Co.*, 307 F.3d 1127, 1134-35 (9th Cir. 2002) (holding that j(5) exclusion did not bar coverage for damage to subcontractors' work because damage did not arise from insured's performing operations on subcontractors' work).

### D.  Other Issues

The insurers also claim that the district court erred in holding that they were not prejudiced by a delay in notice. We find no error in this conclusion.

Appellants further challenge the district court's ruling that, by refusing to defend Standard against the underlying action by Love, appellants waived any right to control the settlement.  We believe, however, that the district court's ruling on this issue was correct. *See, e.g., Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 193 F.3d 966, 970 (8th Cir. 1999) (noting that by refusing to defend, the insurer gives up its contractual right to control defense, and insured may negotiate reasonable settlement); *Cambridge Mut. Fire Ins. Co.*, 692 A.2d 1388, 1391-92 (Me. 1997) (similar); *Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawai'i*, 875 P.2d 894, 913 (Haw. 1994) (by breaching duty to defend, insurer forfeits any right to control defense costs and strategy; insured is then entitled to negotiate reasonable settlement).

For the foregoing reasons, the district court's judgment is affirmed.

_____

### CONCURRENCE

_____

ROGERS, Circuit Judge, concurring.    I concur in the majority opinion.  I write separately to explain why, in my view, the seemingly applicable "j(5)" exclusion does not apply in the circumstances of this case.

The insurance policies in this case, in the "j(5)" exclusion, exclude coverage for "property damage" to

> That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations.

Notably, the policies do not define "performing operations" or "operations."

Two canons of constructions are crucial to my resolution of this issue.  First, the insurer bears the burden of showing that an exception applies.  *Interstate Life & Acc. Ins. Co. v. Gammons*, 408 S.W.2d 397, 399 (Tenn. Ct. App. 1966). Second, ambiguous insurance contracts, and, in particular, ambiguous language limiting coverage, are construed in favor of the insured.  *American Justice Ins. Reciprocal v. Hutchinson*, 15 S.W.3d 811, 815 (Tenn. 2000); *Interstate Life & Acc. Ins. Co.*, 408 S.W.2d at 399.

The insurers argue that the j(5) exclusion applies because, under Standard's contract with the State of Tennessee, Standard was required to dispose of construction debris.  As explained in the majority opinion, Standard entered into a contract with the State of Tennessee to perform paving and road widening work as part of a state project to widen Highway 64 from two to five lanes.  In the contract, Standard

agreed to "clear and grub" vegetation and debris, to remove "structures and obstructions," and to dispose of this material "outside the limits of view from the project." Regarding the "clearing and grubbing," Standard was required to "make all necessary arrangements with property owners for obtaining suitable disposal locations," and the cost involved was "included in the unit price bid for other items of construction." Regarding the removal of "structures and obstructions," the contract provided that, "[i]f the material is disposed of on private property, [Standard] shall secure written permission from the property owner."

While in my view the question is close, the term "operations" is ambiguous in that it is not clear whether Standard was "performing operations" on Ms. Love's property when it dumped debris there. It is true that Standard was required under the contract to dispose of construction debris and to obtain permission from any property owners on whose property Standard chose to dispose of the debris. However, Standard was not obligated to dispose of the debris in any particular fashion—Standard owned the debris once it was removed and could dispose of it in a number of ways. It was not necessary for Standard to dump debris on Ms. Love's property in order to fulfill its contract to widen the highway. The requirement that Standard obtain permission before it dumped debris on private land simply served to shield the State of Tennessee from liability to third parties. As the district court found, "work on Ms. Love's property was an additional duty or task that Standard was to undertake through additional contracts with adjacent landowners." Or as Standard argues, it was "hired" to widen a road—not to perform work on Ms. Love's land.

Thus, given that the canons of construction favor coverage, and that, as explained in the majority opinion, coverage in the present case coincides with the underlying purpose of CGL insurance, the district court properly concluded that the j(5) exclusion does not apply.