OPINION
{¶ 1} Although originally placed on our accelerated calendar, we have elected, pursuant to Local Rule 12(5), to issue a full opinion in lieu of a judgment entry.
 {¶ 2} Defendant-Appellant, Erie Insurance ("Erie"), [1] appeal the judgment of the Allen County Court of Common Pleas granting partial summary judgment in favor of Plaintiff-Appellee, Beaverdam Contracting, Inc. ("Beaverdam"). On appeal, Erie asserts that the trial court erred in finding that Erie was obligated to defend a lawsuit against Beaverdam under the terms of the company's commercial general liability insurance policy. Based upon the following, we affirm the judgment of the trial court. *Page 3 
 {¶ 3} Beaverdam is a contractor insured by Erie under an UltraFlex Package Policy, number Q41-2250493, which included commercial general liability ("CGL") coverage. There is no dispute that the policy was in full force and effect at the time of the incident.
 {¶ 4} In early 2005, as part of a nature habitat restoration project, the Village of Cairo, Ohio ("the Village"), gave permission to the local chapter of Pheasants Forever to clear property along an abandoned railroad easement that the Village had acquired. Pheasants Forever hired Beaverdam to clear all the brush, weeds, scrub trees, etc. from the Village's property so that Pheasants Forever could restore the area and create a wildlife habitat.
 {¶ 5} In September 2005, Beaverdam began to clear the property for Pheasants Forever. Beaverdam did not ascertain where the exact boundaries of the Village property were located before proceeding and unknowingly cleared land that belonged to Bryan and Kimberly Fair ("the Fairs") that was adjacent to the Village's easement property. The Fairs' property was allegedly stripped of all trees and vegetation and left "barren."
 {¶ 6} In December 2006, the Fairs filed suit against Beaverdam and Pheasants Forever, Case No. CV 2006 1229, in the Allen County Court of Common Pleas. In their complaint the Fairs alleged: (1) that Beaverdam "trespassed upon their property without their permission" and proceeded to *Page 4 
"bulldoze and clear the land"; (2) that Beaverdam "negligently bulldozed and cleared [their] property"; (3) that Beaverdam recklessly cut down and destroyed vegetation on their property in violation of R.C. 901.51[2]; and, (4) that Beaverdam had knowledge, or should have had knowledge, of where the property lines were, and "were expected to perform their work only on that property for which they were permitted." Various types of damage were alleged, including trespass, removal of trees, leaving piles of brush, making ruts in the ground, and leaving the property barren and in "complete ruin."
 {¶ 7} As a result of the Fairs' complaint, Beaverdam requested defense and indemnification from Erie under its CGL policy. The policy defines its coverages for bodily injury and property damage as follows:
1. Insuring Agreement
 a. will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. * * *
The policy further states that the insurance will apply only if the bodily injury or property damage is caused by an "occurrence" that takes place in the "coverage *Page 5 
territory" and during the policy period. The term "occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."
 {¶ 8} In March 2006 and in January 2007, Erie sent letters to Beaverdam denying coverage and stating that it had no duty to defend or indemnify under the policy because the incident was not an accidental "occurrence" and the 2(j)(5) "work in progress" exclusion was applicable. Erie also included a reservation of rights statement.
 {¶ 9} Both Beaverdam and Erie sought declaratory judgments concerning Erie's obligations to defend and indemnify Beaverdam under the terms of the insurance contract, along with other issues, which are not the subject of this appeal.[3]
 {¶ 10} In December 2007, Beaverdam filed a motion for partial summary judgment as to Erie's duty to defend, and Erie subsequently filed a cross motion for summary judgment on the issues of defense and indemnity.
 {¶ 11} In February 2008, the trial court issued its decision on the motions for summary judgment, addressing the following two issues:
 (1) Whether Erie is obligated to defend Beaverdam; and, *Page 6 
 (2) Whether Erie must indemnify Beaverdam in the event the Fairs recover under their complaint in CV 2006 1229.
 {¶ 12} The trial court found that Erie had a duty to defend Beaverdam, but it did not rule on whether Erie had a duty to indemnify Beaverdam in the event the Fairs succeeded in their suit against Beaverdam. The trial court included Civ. R. 54(B) language stating that there was no just reason for delay.[4]
 {¶ 13} In its judgment entry granting partial summary judgment in favor of Beaverdam, the trial court stated:
 Erie Insurance Company's purpose statement in the insurance agreement stated that they will provide as near perfect protection, and as near perfect service, as humanly possible. It is apparent to the Court that the insurance agreement between Beaverdam and Erie was intended to protect the insured from the "occurrence" that happened in this case. If there is no coverage for this situation, then what is the point of purchasing insurance?
 The court finds that within the clear language of the insurance agreement the allegations made by the Fairs potentially and arguably fall within the policy coverage. Once Erie Insurance Company was presented with a request for defense, its duty to defend was absolute.
 {¶ 14} It is from this judgment that Erie appeals, presenting the following assignment of error for our review.
 THE TRIAL COURT COMMITTED ERROR WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF APPELLEE, BEAVERDAM CONTRACTING, INC., *Page 7 BECAUSE COVERAGE WAS EXCLUDED BY THE WORK IN PROGRESS AND FAULTY WORKMANSHIP EXCLUSIONS.
 {¶ 15} Erie argues that it has no duty to defend or indemnify Beaverdam because the claims which are the subject of the lawsuit against the insured are not within the policy's coverage. Specifically, Erie maintains that the claims are precluded by two policy exclusions, the "work in progress" exclusion and the "faulty workmanship exclusion," and, therefore, Erie does not have a duty to defend Beaverdam under the terms of the insurance policy.[5] We disagree.
 {¶ 16} An appellate court reviews a summary judgment order de novo.Hillyer v. State Farm Mut. Auto. Ins. Co. (1999), 131 Ohio App.3d 172,175. Summary judgment is appropriate when, looking at the evidence as a whole: (1) no genuine issues of material fact remain to be litigated; (2) construing the evidence most strongly in favor of the nonmoving party, it appears that reasonable minds could only conclude in favor of the moving party, and (3) the moving party is entitled to judgment as a matter of law. Civ. R. 56(C); Horton v. Harwick Chemical Corp.,73 Ohio St.3d 679, 686-687, 1995-Ohio-286. *Page 8 
 {¶ 17} Insurance policies are contracts and their interpretation is a matter of law for the court. Sharonville v. Am. Employers Ins. Co.,109 Ohio St.3d 186, 187, 2006-Ohio-2180, ¶ 6, citing Alexander v. BuckeyePipe Line Co. (1978), 53 Ohio St.2d 241, paragraph one of the syllabus. Contract terms are to be given their plain and ordinary meaning. Id. Insurance coverage is determined by reasonably construing the contract "`in conformity with the intention of the parties'" according to the ordinary and commonly understood meaning of the language used. La PlasCondo. Assn. v. Utica Natl. Ins. Group, 3d. Dist. No. 5-04-15, 2004-Ohio-5347, ¶ 19, quoting King v. Nationwide Ins. Co. (1988),35 Ohio St.3d 208, 211. When insurance contract provisions are reasonably susceptible of more than one interpretation, they "will be construed strictly against the insurer and liberally in favor of the insured."King, 35 Ohio St.3d 208, at syllabus.
 {¶ 18} Furthermore, "an exclusion in an insurance policy will be interpreted as applying only to that which is clearly intended to be excluded." Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd. (1992),64 Ohio St.3d 657, 665 (emphasis sic). "The insurer, being the one who selects the language in the contract, must be specific in its use; an exclusion from liability must be clear and exact in order to be given effect." Lane v. Grange Mut. Cos. (1989), 45 Ohio St.3d 63, 65, citingAm. Fin. Corp. v. Fireman's Fund Ins. Co. (1968), 15 Ohio St.2d 171. *Page 9 
 {¶ 19} The party seeking to recover under an insurance policy generally bears the burden of demonstrating coverage under the policy as well as proving a loss. See Chicago Title Ins. Co. v. Huntington Natl.Bank, 87 Ohio St.3d 270, 273, 1999-Ohio-62. However, when an insurer denies liability coverage based upon a policy exclusion, the insurer bears the burden of demonstrating the applicability of the exclusion. See Continental Ins. Co. v. Louis Marx Co. (1980), 64 Ohio St.2d 399, at syllabus.
 Duty to Defend {¶ 20} An insurer's duty to defend is broader than the duty to indemnify. Ohio Govt. Risk Mgt. Plan v. Harrison, 115 Ohio St.3d 241,2007-Ohio-4948, ¶ 19. The duty of an insurance company to defend an action against an insured is determined by the scope of the allegations of the claim. Motorists Mut. Ins. Co. v. Trainor (1973),33 Ohio St.2d 41, paragraph two of the syllabus. "[When] the complaint brings the action within the coverage of the policy, the insurer is required to make the defense, regardless of the ultimate outcome of the action or its liability to the insured." Id Even when the action is not clearly within the policy coverage, but the allegations could arguably or potentially state a claim within the policy coverage, the insurer still has a responsibility to defend the entire action. Sanderson v. OhioEdison Co. (1994), 69 Ohio St.3d 582, 586; Willoughby Hills v.Cincinnati Ins. Co. (1984), 9 Ohio St.3d 177. "Only if there is no *Page 10 
possibility of coverage under the policy based on the allegations in the complaint will the insurer not have a duty to defend the action."Erie Ins. Exchange v. Colony Dev. Corp. (1999), 136 Ohio App.3d 406,413.
 {¶ 21} However, where an insurance contract excludes coverage for the claim against the insured, no duty to defend will arise. Zanco v.Michigan Mut. Ins. Co. (1984), 11 Ohio St.3d 114, 116. In such cases, there is no duty to defend because the allegations in the pleadings fall squarely within an area of activity specifically excluded from coverage. Id.
 {¶ 22} The duty of the insurance company to defend is separate from the duty of the insurance company to indemnify. Willoughby Hills, supra. Once a duty to defend is recognized, "speculation about the insurer's ultimate obligation to indemnify is premature until facts excluding coverage are revealed during the defense of the litigation and the insurer timely reserves its rights to deny coverage." Erie Ins.Exchange, 136 Ohio App.3d at 413.
 Business Risk Exclusions {¶ 23} Beaverdam believes that Erie has a duty to defend because the lawsuit states a claim that is within the policy coverage. Erie, however, maintains that there is no duty to defend because Beaverdam's actions fall under two policy exclusions: 2(j)(5), the "work in progress" exclusion, and 2(j)(6), the "faulty workmanship" or "your work" exclusion. *Page 11 
 {¶ 24} Section two of the CGL policy, titled "Exclusions," states that the insurance does not apply to:
 j. Damage To Property "Property damage" to: * * *
 5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
 6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
 {¶ 25} "Your work" is defined by the policy as "[w]ork or operations performed by you or on your behalf * * *." The two exclusions at issue here are typical of a group of exclusions commonly included in commercial general liability policies that are referred to as "business risk" exclusions. General liability policies are not intended to protect business owners against every risk of operating a business. Heile v.Herrmann (1999), 136 Ohio App.3d 351, 353. "Business risks" are considered the "`normal, frequent, or predictable consequences of doing business, and which business management can and should control or manage.'" Id., quoting Columbia Mut. Ins. Co. v. Schauf (Mo. 1998), 967 S.W.2d 74, 77. Courts have generally concluded that such policies are intended to insure the risks of an insured causing damage to other persons and *Page 12 
their property, but they are not intended to insure the risks of the insured causing damages to the insured's own work. Id. General liability policies are not intended to insure against a breach of contract or poor workmanship, but instead are intended to insure against "the unpredictable, potentially unlimited liability that can result from business accidents." Erie Ins. Exchange v. Colony Dev. Corp., 10th Dist. Nos. 02AP-1087 02AP1088, 2003-Ohio-7232, at ¶ 29, citing 4 Bruner O'Connor on Construction Law (2002) 126-127, Section 11:37.
 {¶ 26} Therefore, we must review these two exclusions to determine whether all of the claims against Beaverdam fall within either of the two exclusions, thereby precluding any duty to defend on the part of Erie.
 {¶ 27} Erie relies exclusively upon the appellate court decision inInterstate Properties v. Prasanna, Inc., 9th Dist. Nos. 22734 22757,2006-Ohio-2686, in support of its argument that the 2(j)(5) "work in progress" exclusion bars coverage where an excavating company causes damage to an adjacent property. However, we find the decision inInterstate is distinguishable in several respects, and therefore, inapplicable to the circumstances in this case.
 {¶ 28} The events in Interstate occurred during the construction of a hotel. While in the process of excavating the land around the hotel, the contractors went onto the land of the adjoining property owner (Interstate Properties) and allegedly damaged the property by removing some of the surface area of the land. *Page 13 Interstate, 2006-Ohio-2686, at ¶ 2. The damages in Interstate apparently occurred when the contractor inadvertently crossed the property line "while they graded the hotel property." Id. at ¶ 46. The contractor testified that "while he was grading the area around the hotel, he went onto the adjoining property and sand and gravel broke off during the excavation." Id. at ¶ 40. (Emphasis added.) The contractor was actively involved in doing his assigned job when the damage occurred. In contrast, the facts in the case sub judice indicate that Beaverdam did not merely cause some incidental damage while in the process of clearing the assigned Village property; Beaverdam mistakenly went onto and cleared an entirely wrong parcel of land, having nothing to do with its contracted work assignment.
 {¶ 29} Furthermore, in response to the motion for summary judgment, the defendants in Interstate did not directly dispute any of the facts or legal arguments raised by the insurance company, and failed to cite any cases that construed the language of the insurance policy clauses in question. Id. at ¶¶ 41-42. The appellate court stated that the insured argued cases interpreting an exclusion clause with different language than the policy in question. "Thus, the [insured parties] failed to demonstrate that the language of this exclusion is inapplicable to the facts of this case." Id. at ¶ 42. "The [insured parties] failed to raise a genuine issue of material fact because they presented nothing to the trial court to demonstrate that the damages at issue even arguably fell outside of the `works in progress' *Page 14 
exclusion * * *." Id. at ¶ 47. Whereas, in the case before us, Beaverdam has provided numerous authorities supporting its position, in cases interpreting insurance contracts with the exact same language and exclusions.
 {¶ 30} We do not find the decision in Interstate persuasive in relation to the specific facts and issues in this case. First, the factual circumstances giving rise to the damages are distinguishable. Further, the party challenging the insurer failed to correctly argue and support its case.
 {¶ 31} While the Supreme Court of Ohio has not specifically ruled on the applicability of these provisions in similar circumstances, several courts in other jurisdictions have examined and analyzed these exact exclusions.[6] Beaverdam has pointed to several such authorities that have interpreted the same "2(j)(5)" and "2(j)(6)" exclusions and found them to be inapplicable in very similar instances.
 {¶ 32} The Supreme Court of Minnesota decided a case with nearly identical facts in Thommes v. Milwaukee Ins. Co. (Minn. 2002),641 N.W.2d 877. Thommes Thomas Land Clearing was a partnership engaged in the business of cleaning and grubbing land for construction projects, and it entered into a subcontract to clear and grub land for a commercial developer. This land was adjacent to property owned by the Krajewskis. Thommes mistakenly entered upon *Page 15 
the Krajewskis' land, and cleared and grubbed a portion of it without permission. Thommes sought defense and indemnity from its insurer, and the insurer declined coverage, relying upon the same 2(j)(5) and 2(j)(6) exclusions that Erie relies upon here.
 {¶ 33} The Minnesota Supreme Court concluded that both exclusions were ambiguous, and thus, unenforceable. Thommes, 641 N.W.2d at 883-84. With respect to the 2(j)(5) exclusion, the court stated:
 [The insurance company] asserts that the phrase "that particular part of real property on which you * * * are performing operations" clearly and unambiguously includes property of third parties. In response, Thommes argues that the language is intended to apply only to real property identified in its clearing and grubbing contract, and not to real property owned by a third party. We note that the policy does not define the phrase "that particular part of real property" or the word "operations." Nor is there any express language indicating that the phrase "that particular part of real property" includes the property of third parties or that the word "operations" is intended to include operations performed on the property of third parties. Given the underlying purpose of CGL insurance, we conclude that the phrase "that particular part of real property" and the word "operations," as used in Thommes's CGL policy are ambiguous. Because insurance contract exclusions are to be construed strictly against the insurer and because * * * we will avoid an interpretation of an insurance contract that forfeits the rights of the insured unless such an intent is manifest in clear and unambiguous language, we conclude that exclusion 2j(5) does not operate to bar the damage to the Krajewskis' property from coverage.
Thommes, 641 N.W.2d at 883. *Page 16 
 {¶ 34} The Minnesota Supreme Court then analyzed the 2(j)(6) exclusion and also concluded that it was also ambiguous because there were at least two possible interpretations as to the meaning of "incorrectly performed." Id. The language of the exclusion could reasonably refer to the damage that resulted from work performed on the wrong property, and yet, it could also be reasonably interpreted to refer to the manner, rather than the place, in which the work was performed. Id. Because the word "incorrect" means faulty or defective, under the second reading the exclusion would not apply because there was no allegation that Thommes' work was performed in a faulty or defective manner. Thommes,641 N.W.2d at 883-84.
 {¶ 35} An Illinois intermediate court also decided a case with facts that are similar to this case in Pekin Ins. Co. v. Miller
(Ill.App. 2006), 854 N.E.2d 693. Ken Miller operated a tree cutting service and was retained to remove trees from Lots 13, 14, and 15 in a subdivision. Miller mistakenly cleared trees from lots 10, 11, and 12, and the owners of these lots sued him. Miller's insurer denied a duty to defend or indemnify.
 {¶ 36} The court first analyzed whether the allegations against Miller satisfied the policy's definition of "occurrence." In evaluating that issue, the court indicated that "the Plaintiffs in the underlying complaint do not allege Miller used *Page 17 
improper techniques in removing trees on their property. Rather, they allege he removed trees on the wrong property." Pekin,854 N.E.2d at 696.
 {¶ 37} The court in Pekin also found that both exclusions were ambiguous because they were susceptible to multiple reasonable interpretations. Id. at 700. For example, the court found that it was not clear whether exclusion 2(j)(5) referred to any property or only the property on which the insured was contractually obligated to perform operations. Id. at 699. As to the 2(j)(6) exclusion, the court also found that the phrase "incorrectly performed" could refer to the manner in which the trees were removed or to the location from which they were removed. Id. at 700.
 {¶ 38} The courts in both Thommes and Pekin placed considerable credence upon the fact that the damages were to a third party, and not the contractor's customer. The courts distinguished between two types of risks undertaken by an insured contractor. First, there is the "business risk" — "the risk that the insured `may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity[,]'" which is generally not covered by CGL policies. Thommes, 641 N.W.2d at 881
(citations omitted). However, "CGL policies are intended to insure against the second type of risk — `the risk that [the contractor's] work or product will cause bodily injury or property damage to other property,' which may give *Page 18 
rise to tort liability to third parties." Pekin, 854 N.E.2d at 699, quoting Thommes, 641 N.W.2d at 881.
 {¶ 39} The Sixth Circuit Court of Appeals applied Tennessee law[7]
to a factually analogous situation in Standard Constr. v. MarylandCas. (C.A.6, 2004), 359 F.3d 846. A construction contractor mistakenly believed that it had obtained permission to dump construction debris on property owned by a third party. It did not have permission, and the general contractor sought defense and indemnity from its insurer for the resulting lawsuit and damages.
 {¶ 40} After first determining that the allegations against the contractor established an "occurrence" under the policy, the court found that the business risk exclusions in the policy did not preclude coverage. The Sixth Circuit Court concluded that the "your work" exclusion did not apply because the property owner was a third person, not a party to the contract, and because "[it was] not themanner in which the dumping was performed (the `work') that [was] faulty or caused damage, but rather that the dumping itself at the location in question was unauthorized." Standard Constr., 359 F.2d at 852 (emphasis sic). The Sixth Circuit Court also rejected the claimed applicability of the 2(j)(5) exclusion. The court stated: *Page 19 
 In other words, there is coverage where there has been physical injury to tangible property that is not the insured's work. As we have pointed out earlier in this opinion, we agree with the district court's view that [the third party property owner's] tangible real property is not the insured's "work," and that it was physically damaged by having the construction debris from the road widening project dumped on it. Therefore, this exclusion does not apply.
Id.
 {¶ 41} More recently, the Supreme Court of Kentucky decided a case where a contractor was hired to demolish only a carport, but mistakenly tore down most of the house along with the carport. Bituminous Cas.Corp. v. Kenway Contr., Inc. (Ky. 2007), 240 S.W.3d 633. The court reviewed the decisions in the cases cited above, along with several others, in its analysis as to whether these two business risk exclusions precluded coverage and a duty to defend under the contractor's CGL policy. The Supreme Court of Kentucky found the 2(j)(5) exclusion was ambiguous as applied to the particular facts in that case and that the 2(j)(6) exclusion did not operate to preclude coverage because the damage was "neither expected nor intended from the perspective of the insured." Bituminous, 240 S.W.3d at 641-42. Citing to the holding in a Rhode Island decision, the court in Bituminous concluded that exclusion 2(j)(6) would only apply if the damage occurred during a necessary stage of performing the job, not if the damage resulted from an accident. Id. at 642, citing Employers Mut. Cas. Co. v. Pires (R.I. 1999),723 A.2d 295. *Page 20 
 {¶ 42} Erie points to two Ohio appellate cases in support of its claim that the 2(j)(6) "faulty workmanship" or "your work" provision excludes coverage for any repairs that become necessary due to the fact that the insured's work was incorrectly performed on the wrong property, specifically LISN v. Commercial Union Ins. Cos. (1992),83 Ohio App.3d 625, and Welfle, Inc. v. The Motorists Ins. Group, 9th Dist. No. 06CA0063-M, 2007-Ohio-1899. In LISN, the insured was hired to remove obsolete cables from a group of functioning cables, but while performing the work, the insured damaged some of the functioning cables. InWelfle, the insured contracted to remove a top layer of asphalt from a county bridge, but in doing so, it damaged part of the underlying concrete bridge deck. In both instances, the reviewing courts held that the work was excluded under the 2(j)(6) faulty workmanship provision.LISN, supra; Welfle, supra. Once again, we find that the facts in the cases cited by Erie are distinguishable. In all of the above cases, the contractors were in the process of doing the job they were hired to do, they were working on their customers' property, and the damages were sustained by the customer — not a third party. Essentially, the insured parties incorrectly performed the work they were hired to do for their customers, and the customers sought compensation for damages.
 Analysis *Page 21 {¶ 43} The facts in Thommes and Pekin, supra, are nearly identical to the facts before us now. In both Thommes and Pekin, the reviewing courts found that the same two business risk exclusions that we are now reviewing, were ambiguous, and thus, did not preclude coverage. There is merit to that conclusion, especially in light of the fact that both Erie and Beaverdam provided reasonable, but very different, interpretations of the 2(j)(5) and 2(j)(6) exclusions. We also note that the phrase "that particular part of real property" and the term "operations" are not defined in the CGL policy, and may be susceptible to more than one interpretation, depending upon the particular facts involved. And, as noted in several of the cases cited above, "incorrectly performed" can certainly be interpreted in more than one way. Policies that are "reasonably susceptible of more than one interpretation * * * will be construed strictly against the insurer and liberally in favor of the insured." Lane v. Grange Mut. Cos. (1989), 45 Ohio St.3d 63, 65
(citations omitted). Therefore, if the exclusions are ambiguous, they should be construed against Erie, and Erie would have a duty to defend.
 {¶ 44} However, we find the reasoning by the Sixth Circuit Court of Appeals in Standard Construction, supra, concerning the relationship of the business risk exclusions to third party claims to be persuasive. We certainly agree that insurance companies are not responsible forall risks or exposures to loss. General liability policies are not intended to insure against a breach of contract or *Page 22 
poor workmanship involved in the regular performance of work, but they are intended to provide protection from certain unexpected and unintended business accidents. This is especially true when the harm befalls a third party who was not involved in the project or agreement.
 {¶ 45} In Standard Construction, the Sixth District Court of Appeals noted:
 The Business Risk exclusions do not purport to bar coverage for personal injuries or for physical injury to other property which are caused by the insured's product or work.
359 F.3d at 853, quoting Peter J. Neeson Phillip J. Meyers, TheComprehensive General Liability Policy and its Business Risk Exclusions:An Overview, 79-80, reprinted in Reference Handbook on the ComprehensiveGeneral Liability Policy (American Bar Ass'n 1995). The court agreed with "the learned authors," particularly their commentary pertinent to construction projects:
 In every construction project, the owner and contractor incur risks or exposure to loss. Some of these risks can be shifted to insurers — others cannot. * * * [The] risk of third party personal injury or property damage claim[s] due to defective workmanship or materials may be shifted by the contractor purchasing a comprehensive general liability insurance policy.
Id. (Emphasis sic.) (additional citations omitted).
 {¶ 46} In the case before us, Beaverdam did not expect Erie to insure its workmanship or the results of the work it did for Pheasants Forever. However, Beaverdam did expect coverage for damage to property other than, and separate *Page 23 
from, the contracted work itself. Beaverdam intended to purchase insurance coverage for damages as a result of an accident or potential tort liability to a third party.
 {¶ 47} Erie maintains that the "work in progress" exclusion includes all real property on which the insured performs its operations, even if it is the wrong property. Clearing the Fairs' property had nothing to do with the land-clearing job that Beaverdam intended to do. The mistake was not part of the assigned work in progress, nor did the damages arise out of the operations that Beaverdam should have been performing. In fact, one of the claims in the Fairs' complaint was for "trespass," which was certainly outside of the scope of the intended operations. Therefore, the 2(j)(5) exclusion is not applicable.
 {¶ 48} Additionally, this was not a case of "poor workmanship" intended to be precluded by the 2(j)(6) exclusion. Erie argues that Beaverdam "failed to protect the property line" and went beyond the Village's property line, and therefore, its work was incorrectly performed. However, the facts suggest that Beaverdam's error involved much more than incorrectly performing its work by "failing to protect the property line" — it cleared an entirely wrong parcel of land, belonging to a third party. The Fairs did not allege that their property was not properly and professionally cleared — they claim that Beaverdam trespassed and ruined their property. We do not agree with Erie's contention that Beaverdam *Page 24 
incorrectly performed its work when it included the Fairs' property in its work for Pheasants Forever. This was clearly a case of accidental damage to the property of a third party who was not in any way involved with the contracted work project, and therefore, the 2(j)(6) provision does not exclude coverage.
 {¶ 49} Under Erie's expansive interpretation of these exclusionary clauses, it is hard to envision any type of injury or damage that would ever be covered during the course and operation of a business. According to Erie, any place where someone is working would be excluded under the "work in progress" exclusion, so this would seem to effectively eliminate all of a company's operations from coverage. And, under the 2(j)(6) exclusion, any work that resulted in damages or harm would obviously be work that was "incorrectly performed," so coverage would again be excluded. Therefore, it seems as if the statement that Erie "will pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies" becomes completely illusory. An insurance provision is illusory when it appears to grant a benefit to the insured, although in reality it does not. Coleman v. Progressive Preferred Ins. Co., 1st Dist. No. C-070779, 2008-Ohio-3568, ¶ 13; GenCorp., Inc. v. AIU Ins.Co. (N.D.Ohio 2000), 104 F.Supp.2d 740, 745. Courts are not inclined to give insurance provisions a meaning that would render them *Page 25 
illusory. GNFH, Inc. v. W. Am. Ins. Co., 172 Ohio App.3d 127,2007-Ohio-2722, ¶ 133; Talbert v. Continental Cas. Co.,157 Ohio App.3d 469, 2004-Ohio-2608.
 {¶ 50} Erie does concede that collateral damages would be covered under the policy. But, if the only damages Erie intended to cover were collateral damages, then the insurance policy could have been greatly simplified by merely stating that the policy only covers collateral damages, and providing a definition as to what constitutes "collateral damages."
 {¶ 51} At this time, we need not determine what is or is not actually covered under the terms of the CGL policy, as the trial court has not ruled on the issue of whether Erie must indemnify Beaverdam if the Fairs are successful in their lawsuit. We need only determine whether any claims raised by the Fairs could potentially or arguably fall within the coverage of the policy, thus triggering Erie's duty to defend. Based on the preceding analysis, we conclude that one or more of the Fairs' claims could potentially fall within the coverage of the insurance policy, and therefore, Erie has a duty to defend Beaverdam in the lawsuit.
 {¶ 52} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed.
 SHAW, P.J., and PRESTON, J., concur.
[1] Erie Insurance states that it is properly known as Erie Insurance Exchange.
[2] R.C. 901.51 states that "[n]o person, without privilege to do so, shall recklessly cut down, destroy, girdle, or otherwise injure a vine, bush, shrub, sapling, tree, or crop standing or growing on the land of another or upon public land." Anyone who violates this provision is liable for triple damages. Id.
[3] Beaverdam has other claims pending in the declaratory judgment action, as it joined causes of action for breach of contract and bad faith. The Fairs were also named as defendants in Beaverdam's declaratory judgment action because of their potential interest in the proceeds of the insurance.
[4] In April 2008, in response to Beaverdam's motion to dismiss this appeal, we found that the judgment was a final appealable order pursuant to R.C. 2505.02(B)(2) and Civ. R. 54(B).
[5] In its letters denying coverage, Erie also claimed that the incident was not an "occurrence" under the terms of the policy. However, Erie specifically chose not to argue the meaning of "occurrence" in its memorandum in opposition to summary judgment, and it did not raise this matter on appeal. We note that many courts in Ohio have reached different conclusions as to whether claims of negligence and/or failure to perform in a workmanlike manner constitute an accident for purposes of establishing an "occurrence" under CGL insurance contracts. SeeDublin Bldg. Sys. v. Selective Ins. Co., 172 Ohio App.3d 196,2007-Ohio-494, ¶¶ 15-17.
[6] The standardized Commercial General Liability Coverage Form was prepared by ISO (Insurance Services Office), and contains common terms and provisions used by insurers across the country. Courts from many jurisdictions have evaluated ISO's form policy language. Given the uniform policy language, judicial decisions from other jurisdiction are persuasive in the absence of Ohio authority on point.
[7] Although the court determined that Tennessee law was applicable, it noted that the opinions and briefs cited to authorities of many jurisdictions, since the policy provisions and cases interpreting them were reasonably uniform. Standard Constr., 359 F.3d at 849. *Page 1