**TENNESSEE FARMERS MUTUAL INSURANCE COMPANY,**
**Plaintiff–Appellee,**

v.

**Margaret W. "Maggie" EVANS, Robert E. Evans, and the Clinton Bank, Defendants–Appellants.**

Supreme Court of Tennessee, at Jackson.

July 1, 1991.

Douglas Hartley, Michael H. White, Memphis, for defendant Bank.

Michael P. Coury, Memphis, for defendant Margaret Evans.

Don G. Owens, Jr., Memphis, for plaintiff-appellee.

## OPINION

DROWOTA, Justice.

This declaratory judgment action involves the interpretation of an exclusionary clause contained in a personal liability insurance policy issued by Tennessee Farmers Mutual Insurance Company ("Tennessee Farmers"), Plaintiff–Appellee, to Margaret Evans, Defendant–Appellant, and her estranged husband, Robert ("Bob") Evans. Tennessee Farmers seeks a declaration that it is not obligated to afford coverage

or representation to Margaret Evans in a suit filed against her and her husband by The Clinton Bank ("Bank"), Defendant–Appellant, after she burned $186,000.00 in cash obtained from a safety deposit box in the bank. The trial court granted summary judgment in favor of the insurance company and the Court of Appeals affirmed as to Mrs. Evans, but reversed with respect to Mr. Evans. We granted the appeal of Mrs. Evans and the Bank to decide whether a liability insurance policy exclusion for property damage "expected or intended by an insured person" is applicable when the insured expected or intended to destroy her husband's property, an insured person, but mistakenly destroys the property of another instead. For the reasons set forth in this opinion, we affirm the disposition of this case made by the courts below with respect to Mrs. Evans.[1]

This litigation arises out of a rather unusual set of circumstances. The record reveals that for several years Mr. and Mrs. Evans resided in Clinton, Kentucky, where they maintained a banking relationship consisting of personal checking accounts, savings accounts, and various loans with the Clinton Bank. There was also an account at the Bank under the name "Technical Adviser's Institute, Inc.," a business operated by Mr. and Mrs. Evans for the purpose of providing consulting services to government defense contractors involved in developing bids for military projects. Mrs. Evans held the title of President and kept track of the Company's billings, security clearances, and various other administrative matters. Mr. Evans was the chief consultant, and in that capacity traveled extensively throughout the country. Because of this, he executed a general power of attorney appointing Mrs. Evans as his attorney in fact so that she could conduct banking transactions and other business matters for the couple while Mr. Evans was out of town.

In late 1985, the Evanses moved from Clinton, Kentucky, to Arlington, Tennessee, near Memphis. Mrs. Evans closed all

---

1. Mr. Evans is not before this Court as Tennessee Farmers has apparently decided not to appeal the disposition with respect to him made by the Court of Appeals.

of the couple's personal and business checking accounts with the Bank in Kentucky with the exception of a small savings account, and subsequently opened up new accounts at banks in the Memphis area. The couple still had an outstanding personal loan with the Bank in the amount of $23,000.00.

In 1986, the couple began experiencing substantial marital difficulties when it was discovered that Mr. Evans was having an affair with a woman in Boston, Massachusetts. For the remainder of 1986 and the first half of 1987, the couple attempted to resolve their marital problems, and Mrs. Evans believed that they had been successful. However, Mr. Evans informed his wife in May, 1987, that he would be moving to Boston with the woman with whom he had the affair a year before who, according to Mrs. Evans' testimony, was "nuts," often conversed with dead people, and was in and out of insane asylums. Mrs. Evans traveled to Boston June 5–7, 1987, to discuss the demise of the marriage and to negotiate a property settlement and support agreement.

After returning to Tennessee, Mrs. Evans contacted the Bank on June 10, 1987, to discuss payments that were due on the couple's outstanding personal loan. She was informed by a bank employee, Laura Thomas, that the bank was holding a bill for "Bob Evans'" safety deposit box in the Bank. Unaware that her husband had ever obtained a safety deposit box, Mrs. Evans inquired further and was told by Ms. Thomas, although Ms. Thomas denies it, that she might want to close out the box since the couple no longer resided in Kentucky. According to Ms. Thomas, Mrs. Evans then falsely stated that her husband had lost the keys to the box when they were stolen with his briefcase while in an airport in California and had asked if there was another way to get into the box. After checking with a bank officer, Ms. Thomas told her that since she had her husband's power of attorney, she could have the safety deposit box drilled open by a locksmith for a fee of $35.00. According to Mrs. Evans, she assumed that her husband had rented the box and simply forgot to tell her. In any event,

it was agreed that Mrs. Evans would come to the bank the next day to retrieve the contents of the safety deposit box which bore the number 234 and was rented under the name "Bob Evans."

On the next day, June 11, 1987, Mrs. Evans traveled to the Bank, indicated that the safety deposit box belonged to her husband after examining the signature card, signed the signature card which contained the name "Bob Evans" (as well as his signature), and had a locksmith open the box. To her astonishment, she discovered a large sum of cash ($186,000.00) secured in several bundles by paper clips, rubber bands, and paper bands bearing the handwriting of her husband. Mrs. Evans placed some of the cash in a paper bag that was also in the safety deposit box, and requested some envelopes from the Bank in which to put the rest of the money. She then departed the Bank.

It is clear that Mrs. Evans was distraught upon finding the large sum of cash as she believed that it must have been obtained illegally by her husband through drug sales, espionage, or unlawful dealings connected with their government defense contracting business. Fearing that she had implicated herself by signing a receipt for the contents of the safety deposit box, she burned the money immediately upon returning to her home, where her son was burning logs, brush, and trash in a large pile. The son testified that he saw his mother throw the envelopes into the fire and then realized that the envelopes contained money. In response to his question of why she was burning money, she replied, "[i]t's filthy. It's dirty money. It was in Bob's box." Explaining in her deposition why she burned the money, Mrs. Evans stated:

> "When I opened that box, it was like all of a sudden the whole dream had come apart, because there was not supposed to be that kind of money, and it had to be illegal money. I had just received a phone call from ... the FBI going over with me all of the reasons to watch your personnel.

All of the lies that had been told to me for the last six months jumped out of that box like snakes, and I knew that that money was illegal, and that it was either drug money or espionage money; that my husband had jeopardized ten long years for this stinking, lousy money. And I had signed the damn card, and my name was on this card. My whole outlook on life was blown up in front of me. I had to get rid of the money. It was the link between whatever he was into back to me. And I couldn't put it back in the damn box, because we busted the locks. The locks were all over the floor.

All the way back from Clinton to my house it was like I had a tape player in my head and James Flake [an FBI agent] is pounding in my head of all the things that my damn husband is doing right now.

I don't—I was scared to death. My whole life was coming apart over a lousy box full of money and a husband who I no longer knew. I don't know who he is, and I don't know what he has been involved in, but it is dirty and it's nasty and it hasn't stopped yet. It's only beginning. And this is involving a clearance that I signed on the dotted line with the U.S. Government for. I signed the visitor access letters to give him access to the secret information to projects you will never hear about. Do you know what they are worth to somebody else? You put it together. What would you have done with the damn money?

Q. So you felt that destroying this money of his, that was the linking thing was destroying everything that you had?

A. Everything—him, me, the business, and God only knows how many innocent lives, how many people.

Q. So it could have been from—I guess I am paraphrasing what you are saying—it could have been from espionage where he is selling secrets—

A. That is correct.

Q. —or drugs, you didn't know which?

A. I didn't know which.

Q. You are saying it didn't really matter, you just had to get rid of it?

A. Yes, sir. And I am afraid that it wasn't drugs.

Q. Do you still believe that it could possibly be espionage money, do you think that?

A. Yes, sir.

Q. Okay. Was all the money burned that was in the box?

A. Yes, sir. Yes, sir. I did not drive to Clinton with the thought of burning it. That was kind of like a weird—another situation in my life. I live a very strange life. Things happen to me."

An affidavit submitted by Mrs. Evans states that "[a]t all times after obtaining access to the contents of the box, I dealt with the contents with the belief that the property belonged to my husband and that I had a right to possess the property because of the power of attorney and because I believe it belonged to my husband."

Approximately three weeks after Mrs. Evans burned the money, she was contacted by an officer of the Clinton Bank who informed her that the safety deposit box in the name of "Bob Evans" did not belong to her husband, and that the box had actually been leased to "Roy Dillard" under the name "Bob Evans." Upon contacting Dillard, it was discovered by the Bank that the box had contained $186,000.00 in cash at the time Mrs. Evans withdrew the contents. The Bank demanded the return of the money, but Mrs. Evans refused. The Bank reimbursed the estate of Roy Dillard who died after the money was burned, and then sued Mr. and Mrs. Evans. Since burning the money, Mrs. Evans has not contacted her husband to ask him about where the money had come from or how his name came to be placed on the signature card of the safety deposit box. It appears that the Secret Service, Department of Defense, FBI, Treasury Department, IRS, and FDIC are also interested in learning more about the circumstances described above given the fact that the Evanses had access to state secrets in light of their secret security clearances with the U.S. Government. It is also interesting to note that a lock box

was obtained in Orange County, California, in the name of Bob Evans, but was found to be empty upon inspection by Mrs. Evans at the urging of her attorney. There is no explanation contained in the record why the Bank permitted Roy Dillard to maintain a safety deposit box under a false name, "Bob Evans," or why Roy Dillard thought it necessary to do so in the first place. Dillard apparently died before discovery was undertaken.

During the time that the events described above took place, the Evanses were insured under a farm owner's liability policy issued by Tennessee Farmers. The coverage portion of the policy provides in pertinent part: "We will pay all sums arising out of any one loss which an insured person becomes legally obligated to pay as damages because of bodily injury or property damage covered by this policy. If a claim is made or suit is brought against the insured person for liability, we will defend the insured person at our expense...." Significantly, the policy contained an exclusion for property damage "expected or intended by an insured person."

After Tennessee Farmer's filed its declaratory judgment action and after completing discovery, it moved for summary judgment. The Chancellor granted the motion, deciding that the exclusion was applicable to both Mr. and Mrs. Evans, and thus there was no coverage and no duty to defend. The Court of Appeals affirmed the Chancellor's conclusion with respect to Mrs. Evans, but reversed as to Mr. Evans. The rationale concerning Mr. Evans was that Tennessee Farmers had a duty to defend because he did not "expect or intend" the damage that had taken place to the money. With respect to Mrs. Evans, the intermediate appellate court held that "[o]ur reading of the factual allegations reveal that the Clinton Bank's claim against Mrs. Evans is one for property damage expected or intended by an insured person and, therefore, [Tennessee Farmers] has no obligation to provide a defense on her behalf."

Mrs. Evans argues that although she may have intentionally, willfully, and deliberately obtained the contents of the safety deposit box which both she and the Bank believed belonged to her husband, there was no intent to misappropriate or destroy anything belonging to Dillard. That is, although Dillard suffered property damage when the money was removed from the Bank and burned, the infliction of damage was not "expected or intended" by Mrs. Evans because she sincerely believed that the money was her husband's. Indeed, Mrs. Evans testified: "At no time did I seek and obtain access to the box or dispose of its contents with any intent or expectation to cause injury or property damage to the Clinton Bank or Roy Dillard or anyone else." Mrs. Evans urges that she could not have reasonably expected or intended the actual injury inflicted on Dillard when she (1) was advised by the Bank that lock box 234 belonged to her husband, (2) obtained access to the contents of the box under the sincere belief that it belonged to her husband and, (3) disposed of the contents of the box thinking it was her husband's, having no intention or expectation whatsoever concerning Dillard. She also argues that the burning of the money is completely irrelevant because Dillard lost the use and possession of the contents of the box once the sanctity of the box was breached and its contents removed. Finally, Mrs. Evans draws our attention to the fact that the complaint itself does not allege that she expected or intended to cause property damage to Dillard or to the Bank, but alleged instead that she is guilty of fraud, deceit, misrepresentation, and conversion. The Bank likewise maintains that the exclusion does not apply because, although Mrs. Evans intentionally engaged in acts which constitute conversion through the removal and refusal to return the $186,000.00, there is no proof of any intent or expectation on her part that any injury or harm to Dillard would occur.

I.

The case law nationwide is split regarding the proper interpretation of insurance policy clauses that exclude liability for property damage expected or intended by an insured person. *See* Annotation, *Insur-*

*ance—Intended or Expected Injury*, 31 A.L.R.4th 957 (1984). The division among the opinions stems from disagreement over whether the focus in any given case should be on (1) the insured's intent regarding his actions or (2) his intent regarding the particular consequences of those actions or (3) both. Keeton, *Insurance Law* 519–24 (1988). There is agreement, however, that the purpose of such exclusionary language is to prohibit the use of insurance to provide indemnity for civil tort liability that results from an insured's intentional wrongdoing. 31 A.L.R.4th at 976; Keeton at 519; 7A J. Appleman, *Insurance Law and Practice*, § 4501.09 (1979). Otherwise, a liability policy could be used as a license to wreak havoc at will. There is also general agreement that the party whose intent is relevant is the insured party, not the injured party. *See* Keeton at 510–12.

As mentioned, there are a variety of ways courts have approached the problem presented here where an insured urges that even though an action of some type was intended, the specific consequences that resulted were not intended. One approach has been to decide whether there was an intent to do "some" harm, which disregards the question of whether the insured wanted to cause the particular harm that resulted. Keeton at 520. This approach precludes coverage for an insured who intended any type of harm to any person. Thus, the scope of this view is obviously quite broad and, as a result, few jurisdictions have adopted it. *Id.* A second approach has been to focus on whether the insured intended to commit the act and also intended to commit some type of harm, 31 A.L.R.4th at 983, and some jurisdictions have indicated that the insured's intent in this regard may be actual or inferred from the nature of the act and the accompanying reasonable foreseeability of harm, 31 A.L.R.4th at 988. A third approach is to hold that an exclusionary provision, such as the one in the instant case, applies where an intentional act by an insured person results in injuries or damages that are a natural and probable result of that act. *See, e.g., Armstrong v. Security Insur-*

*ance Group*, 292 Ala. 27, 288 So.2d 134 (1973); *Casualty Reciprocal Exchange v. Thomas*, 7 Kan.App.2d 718, 647 P.2d 1361 (1982); *Northwestern Nat. Casualty Company v. Phalen*, 182 Mont. 448, 597 P.2d 720 (1979); *Vittum v. New Hampshire Insurance Company*, 117 N.H. 1, 369 A.2d 184 (1977); *Argonaut Southwest Insurance Company v. Maupin*, 500 S.W.2d 633 (Texas 1973). A fourth method has been to construe the policy language so that there can be no recovery if the ultimate result is substantially certain to be a consequence of the insured's actions. Keeton at 523. A fifth view has been to hold that the insured must have intended that the act cause the type of injury that actually occurred and, in addition, intended to harm the person who actually sustained the injury. Keeton at 521. Few courts have adopted such a stringent test. *Id.*

A sixth method of analysis has become known as the "damn fool" doctrine, which simply means that coverage is not provided for acts which are simply too ill-conceived to warrant allowing the insured to transfer the risk of such conduct to an insurer. Keeton at 539–41. Discussing this doctrine, Professor Keeton states: "All of these situations involve 'calculated' decisions by insureds. There are many instances in which an insured's course of conduct was intentional, but the consequences which resulted, though highly expectable, were clearly not intended or desired by the insured. When one attempts to predict whether a court will negate the insuror's decision to reject coverage under a liability insurance policy in such cases, an analytical approach that is worth considering is whether the insured's actions fall into the category of incredibly foolish conduct." Keeton at 541.

A seventh view, a combination of some of those mentioned previously, is that the insured must have intended the act and also to have caused some kind of injury in order for the intentional injury exclusion to apply, but once it is found that harm was intended, it is immaterial that the actual harm caused is of a different character or magnitude from that intended by the in-

sured. *See, e.g., Lockhart v. Allstate Ins. Co.,* 119 Ariz. 150, 579 P.2d 1120 (App. 1978); *Butler v. Behaeghe,* 37 Colo.App. 282, 548 P.2d 934 (1976); *Hartford Fire Ins. Co. v. Spreen,* 343 So.2d 649 (Fla.App. 1977); *Colonial Penn Ins. Co. v. Hart,* 162 Ga.App. 333, 291 S.E.2d 410 (1982); *Farmer's Ins. Group v. Sessions,* 100 Idaho 914, 607 P.2d 422 (1980); *Aetna Cas. & Sur. Co. v. Freyer,* 89 Ill.App.3d 617, 44 Ill.Dec. 791, 411 N.E.2d 1157 (1980); *Willis v. Hamilton Mut. Ins. Co.,* 614 S.W.2d 251 (Ky.App.1981); *Firemen's Fund Ins. Co. v. Hill,* 314 N.W.2d 834 (Minn.1982); *Hanover Ins. Co. v. Newcomer,* 585 S.W.2d 285 (Mo.App.1979); *State Farm Fire & Cas. Co. v. Muth,* 190 Neb. 248, 207 N.W.2d 364 (1973); *Lyons v. Hartford Ins. Group,* 125 N.J.Super. 239, 310 A.2d 485 (1973); *Pachucki v. Republic Ins. Co.,* 89 Wis.2d 703, 278 N.W.2d 898 (1979). In other words, where the intentional act has resulted in intentional injury, even where the injury inflicted is different in nature and scope, or more or less severe than that specifically intended, coverage should be denied. *Oakes v. State Farm Fire & Cas. Co.,* 137 N.J.Super. 365, 349 A.2d 102 (1975).

The cases emanating from our intermediate appellate courts in Tennessee appear to adopt a variation of the approaches mentioned above. For example, in *Allstate Ins. Co. v. Merritt,* 772 S.W.2d 911 (Tenn. App.1989), the insured shot a garbage man who was removing trash from the insured's property. For some unknown reason, the insured party mistook him for a dog and shot him with a pistol. The court decided that it is the insured party's intent regarding the consequences of his action that is relevant. "The issue is not whether the insured intentionally fired a weapon, rather whether the insured reasonably expected or intended the *actual* injury inflicted to result from his intentional act of firing the weapon." *Allstate,* 772 S.W.2d at 912.

However, in *Graves v. Liberty Mut. Fire Ins. Co.,* 745 S.W.2d 282 (Tenn.App.1987), the court found that an exclusion for intentional or expected acts applied where the insured committed an assault and battery on a third party. "We believe the exclusion is applicable if injury is intended or expected by the insured where the insured acts with the intent or expectation that injury will result, *even though the resulting injury is different either in character or severity from the injury that was intended.*" (Emphasis added.) *Graves,* 745 S.W.2d at 284.

Finally, in an unreported decision, one of our intermediate appellate courts followed what it termed a majority three-part test for determining whether an exclusion for an intended or expected act would apply: (1) it is necessary that the insured intend both the act as well as intend to cause injury of some type in order for the exclusion to apply; (2) the intent may be actual or inferred by the nature of the act and the accompanying reasonable foreseeability of harm; and (3) once it is found that harm was intended, it is immaterial that the actual harm caused is of a different character or magnitude or nature than that intended.

██ After carefully weighing the implications of the several approaches discussed in the preceding paragraphs, this Court is persuaded that the best approach, and the one that should be adopted in Tennessee, is that followed by a majority of the states that have had an opportunity to construe the language involved in this case. That is, in order to find that an intended or expected acts exclusion applies, it must be established that the insured intended the act *and* also intended or expected that injury would result. These are separate and distinct inquiries because many intentional acts produce unexpected results and comprehensive liability insurance would be somewhat pointless if protection were precluded if, for example, the intent to cause harm was not an essential (and required) showing. *See* 7A J. Appleman, *Insurance Law and Practice* § 4501.09 at 263 (1979). The intent itself may be actual or inferred from the nature of the act and the accompanying reasonable foreseeability of harm. It is immaterial that the actual harm was of a different character or magnitude or nature than that intended. We believe that this approach has the effect of providing a benefit under an insurance policy in exchange for the premiums paid therefor,

without encouraging the insured to incur civil tort liability. In other words, our holding today addresses the concern that were a person able to insure oneself against the economic consequences of wrongdoing, the deterrence attributable to financial responsibility would be missing.

## II.

■ Applying the foregoing test to the facts presented in the case at hand, we conclude that the exclusion applies and, thus, Tennessee Farmers is under no obligation to defend or indemnify Mrs. Evans. It cannot seriously be contended that Mrs. Evans did not intend the act of burning the currency. The record is undisputed that, once she discovered the money in the safety deposit box, she set out to get rid of it because it was "dirty money" and, in order to achieve this, she willfully threw the bundles of cash into the burning brush pile upon returning home from the Bank. Her own testimony supplies the requisite intent in this regard. She stated that she was distraught upon finding the large sum of cash as she believed that it had been obtained illegally by her husband through espionage, drug sales, or perhaps unlawful dealings connected with their government defense contracting business. She stated that "I had to get rid of the money." At another point in her testimony, she replied, "Yes, sir," to the question, "You are saying it really didn't matter, you just had to get rid of it?" She also admitted that all of the money was actually consumed by the fire. Given this testimony, we have no difficulty concluding that Mrs. Evans intended the act of burning the money.

In addition to intentionally committing the act of burning whereby the property was destroyed, there is no question that Mrs. Evans intended or expected that some type of injury would be inflicted by the intentional act of burning. That is, her object was to destroy the money. Again, her testimony clearly reveals that she wanted to get rid of the money, and burning it was the method selected for doing so. Mrs. Evans' contention in this regard is that she is entitled to prevail because, inasmuch as she did not know the identity of the person who actually owned the money, being the party damaged, there was no intent to inflict some manner of harm. This ignores the fact that, by taking the funds in the first place and, secondly, by burning the currency, she was obviously damaging *someone*. She concedes that she knew that the funds were not hers. She claims that she believed them to be her husband's. If that were the case, she was obviously damaging her husband, at least in her own mind. And as we have indicated, it is immaterial that the actual harm was of a different character or magnitude or nature than that intended, and that the intent to inflict harm can be actual or inferred from the nature of the act and the accompanying reasonable foreseeability of harm. We see no reason why Mrs. Evans' mistake as to the true identity of the owner of the property should have any bearing on the analysis. The fact of the matter is that she intended that some type of injury would result, and as it turned out, she was mistaken as to her belief who the person was that would bear the brunt of her intent to do harm.[2] Collaterally, it should be noted that the exclusion in the policy places no importance upon, nor does it mention, the ownership of the property damaged.

For the foregoing reasons, the judgments of the courts below with respect to Mrs. Evans are affirmed, and this case is remanded for any further proceedings which may be necessary. Costs of this appeal shall be split evenly between Mrs. Evans and the Clinton Bank.

---

**2.** Our opinion should not be construed to mean that in all cases a mistake of fact will vitiate coverage. It is conceivable that in some cases, an insured party acting under a mistake of fact would not have the requisite intent to cause harm, even though there is an intent to do the act that resulted in the harm. *See State v. Glens Falls Ins. Co.*, 137 Vt. 313, 404 A.2d 101 (1979) (a

sheriff, in an attempt to satisfy a writ of execution, mistakenly sold property which he believed belonged to the debtor when, in fact, the property actually belonged to another individual). Only after it is established that there was an intent to actually inflict some manner of harm, does it follow that a mistake of fact becomes immaterial.

REID, C.J., and O'BRIEN, DAUGHTREY and ANDERSON, JJ., concur.