IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 2, 2008 Session

## METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY v. WAYNE BUCKNER, ET AL.

Appeal from the Circuit Court for Cocke County
No. 29,274 - II    Richard R. Vance, Judge

No. E2008-00989-COA-R3-CV  - FILED APRIL 30, 2009

Metropolitan Property and Casualty Insurance Company ("the insurance company") brought an action for declaratory judgment against Wayne Buckner ("the policyholder") and others[1] seeking a determination regarding its liability and duty to defend under a homeowners' insurance policy ("the policy") issued to the policyholder.  The insurance company's action was prompted by lawsuits filed following an incident in which the policyholder's two teenage sons, William Russell Buckner and Joshua Thomas Buckner (who will be collectively referred to as "Will and Josh"[2]), fired rifles at tractor-trailers on an interstate highway, resulting in the death of Aaron E. Hamel, the driver of a car, and severe injuries to Kimberly Bede, a passenger in another car.  The lawsuits included a personal injury suit by Ms. Bede and David Hickman,[3] a personal injury suit by Denise Deneau,[4] and a wrongful death action by John Hamel and his wife, Rosemary Hamel.[5]  The plaintiffs and defendants in the underlying lawsuits will be referred to collectively as "Defendants," their posture in this declaratory judgment action.  Defendants filed counterclaims for declaratory judgment, seeking a determination that the policy provides coverage to the defendants in the underlying actions and that

---

[1]The other defendants in the declaratory judgment action are Donna Buckner, the policyholder's wife; William Russell Buckner and Joshua Thomas Buckner, the minor children of the policyholder and his wife; John Hamel and his wife, Rosemary Hamel, the next-of-kin and parents of Aaron E. Hamel, the deceased victim in this case; David Hickman, the driver of one of the vehicles; Kimberly Bede, an injured passenger in the car driven by Hickman; and Denise Deneau, a passenger in the car driven by Aaron E. Hamel.

[2]First names are utilized for convenience only.  No disrespect is intended.

[3]Hickman is not a party to this appeal.  According to Deneau's brief, Hickman voluntarily dismissed his suit pursuant to Tenn. R. Civ. P. 41.01.

[4]Deneau alleges psychological injuries resulting from the shooting death of Aaron E. Hamel, the driver of the car in which she was a passenger.

[5]The record reflects that the trial of all of the underlying lawsuits was stayed pending disposition of this declaratory judgment action.

each of the shootings was a separate, covered occurrence. The trial court, in dismissing the insurance company's complaint and granting judgment on the counterclaims, held, among other things, that an exclusion in the policy against injuries "reasonably expected or intended" by the insured is not implicated by the facts of the underlying suits.[6] We hold that the exclusionary provision applies to bar coverage for the suits against Will Buckner and Josh Buckner. Accordingly, we reverse the judgment of the trial court and enter judgment in favor of the insurance company as to the suits against Will Buckner and Josh Buckner.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J. and D. MICHAEL SWINEY, J., joined.

S. Curtis Rose, Kingsport, Tennessee, and J. Eddie Lauderback, Johnson City, Tennessee, for the appellant, Metropolitan Property and Casualty Insurance Company.

Mark E. Floyd, Knoxville, Tennessee, for the appellees, John Hamel, Rosemary Hamel, and Kimberly Bede.

Gary E. Brewer, Morristown, Tennessee, for the appellee, Denise Deneau.

No appearance by or on behalf of Wayne Buckner, Donna Buckner, William Russell Buckner and Joshua Thomas Buckner.

**OPINION**

I.

The parties agree that the policy provides liability coverage to the members of the policyholder's household, including Will and Josh, and that the policy was in effect at the time of the incident that led to the underlying cases. The parties' stipulation includes the following:

> On June 25, 2003(,) . . . [Will and Josh] were minor children (ages 15 and 13 respectively) living with their parents, . . . [Mr. and Mrs. Buckner], in Newport, Tennessee. On June 25, 2003, [Will and Josh] took possession of two .22 caliber rifles, owned by and under the control of the defendants, and began shooting the rifles at various objects near their home . . . . [Will and Josh] eventually went to a wooded area near their home and Interstate 40 and began shooting the rifles in the direction of traffic on Interstate 40. As a result of [Will

---

[6]The trial court also held that the shooting at the Hamel vehicle and the shooting at the Hickman vehicle were two separate occurrences under the policy. No issue is raised on this appeal with respect to this holding.

and Josh] shooting . . . the rifles, Aaron E. Hamel was shot and killed and Kimberly Bede was severely wounded. Aaron Hamel and Kimberly Bede were traveling in separate vehicles and were struck by separate shots from the rifles shot by [Will and Josh]. Denise Deneau was a passenger in the vehicle being operated by Aaron E. Hamel. Marc David Hickman was the driver of the vehicle occupied by Kimberly Bede. [Will and Josh] were arrested and ultimately entered pleas of true to delinquency in Cocke County Juvenile Court.

The exclusionary clause at issue in this case provides as follows:

**SECTION II - LOSSES WE DO NOT COVER**

**UNDER COVERAGE F - PERSONAL LIABILITY AND COVERAGE G - MEDICAL PAYMENTS TO OTHERS, WE DO NOT COVER:**

1. **bodily injury** or **property damage** which is reasonably expected or intended by **you** or which is the result of **your** intentional and criminal acts. This exclusion is applicable even if **you** lack the mental capacity, for whatever reason, to govern **your** conduct.

(Capitalization and bold print in original).

At the trial below, the insurance company argued that Will and Josh "intended to fire the guns . . ." and "intended to cause some type of harm and it's just a matter that different harms resulted . . . ." Defendants, on the other hand, contended that, although Will and Josh intentionally fired at trucks on the interstate, there was no proof that they ever intended to cause any injury of any kind.

In addition to the stipulated facts and the exclusionary language of the policy, both sides relied upon the testimony of Will and Josh from their previously taken depositions.[7] We quote extensively from relevant portions of those depositions, which were read at trial by counsel.

In his deposition, Will Buckner testified as follows:

Q: On June 25th, 2003, did you shoot a rifle from a patch of woods and shoot that rifle in the direction of traffic on the Interstate?

A: Yes.

Q: And on that day was Josh Buckner with you?

---

[7]The actual depositions are not included in the record on appeal.

A: Yes.

Q: Did he also shoot a rifle in the direction of traffic on the Interstate on June 25th, 2003?

A: Yes.

Q: On June 25, 2003, when you shot a rifle in the direction of traffic on Interstate 40 was it your intention to hurt anyone or kill anyone?

[At this juncture in the proceedings, the attorney reading the deposition said, "Now that answer is 'no.'"]

* * *

Q: What did you do next?

A: I believe we started shooting at the back of the transfer trucks.

Q: Are you talking about tractor-trailer trucks?

A: Yes.

Q: And you were shooting at the trailer part of it?

A: Yes.

Q: You shot in the direction of trucks on the Interstate?

A: Yes.

Q: When you were shooting at the trucks, you knew it would cause property damage to the trucks when the bullets hit the trucks, didn't you?

A: Yes. I didn't think it would cause any . . . I didn't have any thought in the world that it would go through them, though. The most I thought it would do was make a dent.

Q: When you aimed your gun, at either vehicles or trucks, you knew that those bullets would cause, at a bare minimum, property damage to those vehicles, didn't you?

-4-

[At this juncture, the counsel reading the deposition said, "Then there were some objections by counsel, but his answer to that question was 'yes.' "]

* * *

Q: You both discussed shooting at the Interstate?

A: Yes, I believe so.

Q: You aimed the gun at the Interstate?

A: Yes.

Q: You intended to pull the trigger on your gun?

A: Yes.

Q: You pulled the trigger on the gun?

A: Yes.

Q: You expected that gun to fire?

A: Yes.

Q: In the direction of the Interstate?

A: Yes.

Q: The gun did fire in the direction of the Interstate?

A: Yes.

Q:   And you intended that gun to strike some object on the Interstate?

A: Yes.

Portions of Josh Buckner's deposition testimony were also read into evidence.  Relevant parts are as follows:

Q: What was it your intention to do exactly?

A: I didn't have any intentions of anything, sir. Just to shoot at the tractor-trailers or at the end of the semis.

Q: So when you went to the woods that day, are you telling us it was your intention to shoot at tractor-trailer trucks but only at the trailer portion?

A: Our intent was. . . before then was not to shoot at tractor-trailers but to. . . We were out hunting pigeons.

Q: So when you went there it was your intention to shoot at pigeons?

A: Yes, sir.

Q: But while you were there did your intention change to shot [sic] at traffic?

A: Sort of, kind of.

Q: Okay. And were you meaning to shoot only at tractor-trailer trucks and then only at the trailer part?

A: Yes, sir, only the trailer part.

At the conclusion of the insurance company's proof, Defendants moved for dismissal of the company's complaint, asserting that "there was no proof that these children intended to cause any injury . . . ." The trial court reserved ruling on the motion. One of the Defendants' counsel then read into evidence additional excerpts from the deposition of Josh Buckner as follows:

Q: I notice, Josh, from a newspaper article that appeared in the Knoxville paper at that time, in 2003, you had written a letter, according to the paper, and in the letter you said, "I did not mean to hurt anyone." Did you write such a letter?

A: Yes, sir, I did.

Q: Was that a true statement?

A: Yes, sir, I didn't mean to do that.

Q: You did not mean to hurt anyone?

A: No, sir, I did not.

Q: Let me ask you specifically, on June 25, 2003, . . . when you shot a .22 rifle at traffic on I-40, was it your intention to injury [sic] anybody or kill anybody?

A: No, sir.

Q: [W]hen you were shooting did you reasonably expect to injure or kill anyone up there in that patch of woods by the Interstate?

A: So you're asking me if I had hostile intent of doing it?

Q: No. No, not necessarily. That might be another question. Did you have hostile intent?

A: No, sir, I did not.

Q: Okay. Did you reasonably expect for people to get hurt or killed?

A: Was I expecting it?

Q: Yeah?

A. No, sir, I was not.

* * *

Q: How did it come about that you and Will left to go to the patch of woods next to the Interstate?

A: It was a little past midday, starting to cool off. Let's go hunting, get the rifles out of the stump and go pigeon hunting. Then the idea strikes us to shot [sic] tractor-trailers and went from there.

Q: Okay, had you ever had any training at shooting?

A: No, sir.

Q: Okay, when Will moved in the house . . . did he bring the pistol BB gun with him?

A: He brought two pistols and a rifle of his own.

Q: BB?

A: Yes, sir.

-7-

Q: Pellet?

A: Pellet. BB, pellet, same thing.

Q: Okay, so you shot them daily?

A: Almost every day.

Q: Did your father teach you anything about the rifle?

A: He told me that the .22 rifle is about the weakest caliber rifle you can have, that is made, and the bullet can only go a mile, versus a 30.06 bullet going over nine to ten miles. I said, Well, .22's are pretty weak, so therefore I didn't think .22's could even kill much more than a rabbit.

Q: Okay, was that the end of the lesson?

A: No sir, it was just the basics on how to hold the gun, how to use a safety and how to load it.

Q: Is it true you had virtually no experience in gun safety?

A: I had some but I didn't have enough to know that any gun could do a lot of damage.

Further testimony of Will Buckner was placed before the court:

Q: Did you reasonably expect to injure or kill anyone or do any harm when you shot in the direction of traffic that day?

A: No.

*  *  *

Q: While you were walking up there from your house to this place near the Interstate, did you shoot at anything?

A: We shot at a few cans and beer bottles that were floating around the creek.

*  *  *

-8-

Q: Did you play a video game called Grand Theft Auto while you lived there at the Buckner household?

A: Yes.

Q: Did you think that playing that Grand Theft Auto video game had some impact on you related to this shooting?
A: In some ways, yes.

Q: How so?

A: I think it gave us the idea in a way.

Q: Gave you and Josh the idea?

A: Uh-huh, and we just happened to remember it while we was up there.

Q: When you played the video game nobody ever really got hurt, did they?

A: No.

\* \* \*

Q: When you were shooting your rifle into traffic on the Interstate, you knew there was at least a possibility that someone might get hurt?

A: That wasn't really a thought in my mind. I wouldn't think that anybody would have got hurt. Like I said, I didn't even think it would make a dent in the vehicle.

Q: You didn't think there was any possibility anybody would get hurt?

A: No. I didn't think, you know, a bullet would go through a vehicle like that.

At the conclusion of the trial, the court held that the insurance company had not satisfied its burden of establishing that the exclusionary clause applied. The trial court stated, in relevant part, as follows:

\* \* \*

Adopting the facts as set forth in the . . . Stipulation . . . , the Court . . . finds that these two young defendants, age thirteen and fifteen, at the time of the incident, had virtually no firearms training and in particular with .22 caliber rifles.

That on June 25th, 2003, had no set purpose with the firearms other than to shoot cans, bottles, birds, pigeons, whatever they thought would come across while out shooting on their parents' property.

That in the course of that they fired their guns toward trucks on the Interstate Highway, intending to hit the trailers. That they did not fully appreciate the power of the weapons or the damage that could result. Thinking, as they testified, at most, the trailers would be dented if they hit them.

It was clear from their uncontradicted testimony that these young inexperienced teenagers did not intend to shoot at or injure any person and though persons were struck causing the death and injuries as alleged in the various lawsuits, it [brings into question] the meaning and effect of the exclusionary language in Metropolitan's Policy of Insurance . . . .

\* \* \*

The exclusionary paragraph set out in Exhibit #2 has two principal requirements, that is, and that apply in this case that a bodily injury was (1) reasonably expected, or (2) intended or the result of intentional and criminal acts.

\* \* \*

It's important to note also that that exclusionary paragraph begins, it says "Bodily injury or property damage which is reasonably expected, etc." So it separates the two types of damages which could occur, that is either bodily injury or property damage could be covered by this exclusionary language.

\* \* \*

In this case the Court finds that the conduct of Josh Buckner and Will Buckner was negligent, even reckless, but their subjective mental state was not to intentionally harm anyone, any person, and that given their age, inexperience, lack of training, lack of knowledge of the power of the .22 rifle, as compared to the BB guns and pellet guns they had been shooting.

-10-

That they did not reasonably expect that such harm would result. And the Court specifically finds they did not aim at or try to shoot at a person or any other person but at the trailer portion of the tractor-trailer trucks.

With respect to whether or not these acts were the results of criminal acts the Court again must look to the law that applies to the facts in these cases.

These two boys were juveniles, their cases were heard in Juvenile Court. There was no criminal adjudication made in their cases. And while Criminal Statutes of the State of Tennessee could encompass a Reckless Homicide or an Assault under various theories wherein the Criminal Law says that in certain cases intentional can be supplied by recklessness where that is an element of the defense.

But in this case there has been no criminal charge or adjudication. These two teenagers have not been adjudicated and guilty of any Criminal Act.

The Court believes and the proof clearly shows that these two teenagers, young teenagers, were doing what we commonly call "plinking", that is randomly shooting at targets of opportunity, such as cans, bottles, so forth, and perhaps using very, very bad judgment, chose to "plink" at the tractor-trailer, resulting in the tragic death of one person and serious injury to others.

But that the Court respectfully finds that plaintiff, Metropolitan Property & Casualty Insurance Company has not carried its burden of proof and dismisses its Complaint for Declaratory Judgment on its exclusionary clause in the policy of insurance.

## II.

The insurance company timely appeals and raises the following issues:

1. Whether the trial court erred in applying Indiana law in its analysis of the present case.

2. Whether the trial court erred in holding that the exclusionary clause in the homeowners' policy at issue did not apply to relieve the insurance company from defending Will and Josh in this case.

## III.

-11-

Pursuant to Tenn. R. App. P. 13(d), "review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." As for the trial court's conclusions of law, the review remains de novo, but with no presumption of correctness as to the trial court's legal conclusions. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). "In general, the interpretation of an insurance policy is a question of law and not fact." *Charles Hampton's A-1 Signs, Inc. v. American States Ins. Co.*, 225 S.W.3d 482, 487 (Tenn. Ct. App. 2006).

"Insurance contracts are subject to the same rules of construction and enforcement as apply to contracts generally." *McKimm v. Bell*, 790 S.W.2d 526, 527 (Tenn. 1990). They should be "construed as a whole in a reasonable and logical manner." *Standard Fire Ins. Co. v. Chester O'Donley & Assocs., Inc.*, 972 S.W.2d 1, 7 (Tenn. Ct. App. 1998). Disputed contractual language must be examined in the context of the entire agreement. *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985). Words must be given their "usual, natural, and ordinary meaning." *St. Paul Surplus Lines Ins. Co. v. Bishops Gate Ins. Co.*, 725 S.W.2d 948, 951 (Tenn. Ct. App. 1986).

IV.

The insurance company asserts that the trial court erred in relying on Indiana law to support its ruling. At trial, Defendants successfully argued that an Indiana case, *Bolin v. State Farm Fire & Casualty Co.*, 557 N.E. 1084 (Ind. Ct. App. 1990), was persuasive authority. That case is factually on-point with the instant case. *Bolin* involved the interpretation of a provision in a homeowners' policy that excluded coverage for "bodily injury . . . which is expected or intended by an insured." In that case, an 18-year-old insured and some friends spent the afternoon smoking marijuana and then began shooting a pellet gun that the insured had stolen earlier in the day. They shot first at signs, bottles and trees and then took aim at passing cars and trucks. The plaintiff was injured when a pellet from the insured's gun struck him as he drove on the interstate. State Farm sought a declaration that no coverage existed pursuant to the exclusionary language. The trial court granted summary judgment in State Farm's favor and the insured appealed.

On appeal, the intermediate Indiana appellate court focused on the meaning of the word "expected" in the exclusion. The court adopted the following definition: "Expected injury or damage means that the insured acted although he was consciously aware that the harm caused by his actions was practically certain to occur." *Id*. at 1086 (quoting *Indiana Farmers Mutual Ins. Co. v. Graham,* 3d Dist. Ind. App., 537 N.E.2d 510, 512 (1989)). The *Bolin* court explained that the determination of an insured's consciousness of the likelihood that certain results will occur "is determined by examination of the subjective mental state of the insured." *Id*. at 1088. Under this analysis, the court found that the material facts regarding whether the insured expected or intended the injuries suffered by the plaintiff were in dispute. On the one hand, the insured had testified that he knew there was "a chance that [he] could hurt somebody" when he shot at the passing truck, and he was aware that his pump-action rifle was powerful and that its accuracy was improved through the use of a sight; on the other hand, there was evidence that the insured was not a good shot, that he had aimed only at the back of the truck, and that he was under the influence of marijuana at the time of

the shooting. Lastly, the ***Bolin*** court held that "the trial court incorrectly determined that an inference of intent or expectation to injure Compton arose as a matter of law from Bolin's act of shooting a pellet gun at the rear of Compton's truck. The nature of the act is not such that harm to Compton must have been intended or expected." ***Id***. at 1090. Accordingly, in reversing summary judgment, the appeals court held that State Farm had not established beyond dispute that the insured was "consciously aware" that the injury to Compton was "practically certain to occur."

In the present case, the trial court correctly observed that ***Bolin*** was not binding authority in this state, but found that its facts were quite similar and that "[i]ts rationale [was] sound and its legal analysis . . . not inconsistent" with Tennessee case law. On our review of the trial court's ruling, we are inclined to agree with Defendants' assertion that the trial court did not rely on Indiana law *to the exclusion of Tennessee precedent*. In our view, the trial court simply considered ***Bolin***, a factually similar case, along with various Tennessee cases, en route to its ruling. There was no error in the analysis route taken by the trial court; but, of course, the basic question remains whether the trial court correctly applied Tennessee law to the coverage question presented.

V.

The Tennessee Supreme Court has acknowledged the nationwide split among various courts regarding the proper interpretation of insurance policies containing exclusions for damages caused by the intentional acts of the insured. In ***Tennessee Farmers Mutual Ins. Co. v. Evans***, 814 S.W.2d 49 (Tenn. 1991), the High Court considered a personal liability policy that contained an exclusion for property damage "expected or intended by an insured person." ***Id***. at 53. The insurance company in that case had filed a declaratory judgment action after one of its insured, Mrs. Evans, intentionally burned a large sum of money that she discovered in a safe deposit box – money she mistakenly believed belonged to her husband and was the product of his illegal activity. In fact, the deposit box and the money belonged to another man who had inexplicably opened the account under the same name as that of her husband. The bank at which the deposit box was kept sued to recover the money. In the declaratory judgment action, the trial court granted summary judgment to the insurance company.

On appeal, the Supreme Court agreed with the trial court:

> [T]his Court is persuaded that the best approach, and the one that should be adopted in Tennessee, is that followed by a majority of the states that have had an opportunity to construe the language involved in this case. That is, in order to find that an intended or expected acts exclusion applies, it must be established that the insured intended to act and also intended or expected that injury would result. These are separate and distinct inquiries because many intentional acts produce unexpected results and comprehensive liability insurance would be somewhat pointless if protection were precluded if, for example, the intent to cause harm was not an essential (and required) showing. See 7A J. Appleman, Insurance Law and Practice § 4501.09 at 263 (1979). The intent itself may be inferred from the nature of the act

-13-

and the accompanying reasonable foreseeability of harm. It is immaterial that the actual harm was of a different character or magnitude or nature than that intended. We believe that this approach has the effect of providing a benefit under an insurance policy in exchange for the premiums paid therefor, without encouraging the insured to incur civil tort liability. In other words, our holding today addresses the concern that were a person able to insure oneself against the economic consequences of wrongdoing, the deterrence attributable to financial responsibility would be missing.

*Id*. at 55-56.

Applying *Evans*' two-prong analysis, then, we consider whether Will and Josh 1) intended their actions and 2) intended or expected that injury would result. As to the first prong, it is clear that Will and Josh intended to discharge their rifles. The parties stipulated that Will and Josh "began shooting the rifles in the direction of traffic on Interstate 40." The proof shows that Will and Josh had been shooting at cans, bottles, tree limbs and birds sitting atop billboards before they turned their attention to tractor-trailers on the nearby interstate. The first prong under *Evans* is clearly satisfied.

The crux of the dispute in this case turns on an analysis of the second prong of the *Evans* test. This prong brings into play whether the injuries resulting from the shooting were "reasonably expected or intended" by Will and Josh. In *Evans*, the court rejected Mrs. Evans' contention that, because she did not know the identity of the owner of the money, she could not have had any intent to harm him when she destroyed it. In response to this argument, the Supreme Court concluded that there was "no question that Mrs. Evans intended or expected that some type of injury would be inflicted by the intentional act of burning." *Id*. at 56. The court further elaborated:

[B]y taking the funds in the first place and, secondly, by burning the currency, she was obviously damaging someone. She concedes that she knew that the funds were not hers. She claims that she believed them to be her husband's. If that were the case, she was obviously damaging her husband, at least in her own mind. And as we have indicated, it is immaterial that the actual harm was of a different character or magnitude or nature than that intended, and that the intent to inflict harm can be actual or inferred from the nature of the act and the accompanying reasonable foreseeability of harm. We see no reason why Mrs. Evans' mistake as to the true identity of the owner of the property should have any bearing on the analysis. The fact of the matter is that she intended that some type of injury would result, and as it turned out, she was mistaken as to her belief who the person was that would bear the brunt of her intent to do harm.

*Id*.

In the present case, the insurance company does not contend that Will and Josh intended or expected that anyone would be injured by their shooting. Rather, the insurance company submits that, under *Evans*, when they shot, intending or expecting that there would be some, albeit minimal, property damage, but missed and instead inflicted great bodily injury on traveling motorists, the subject exclusionary language is implicated. We agree. The proof at the trial established that Will and Josh intended or expected that some type of harm would result when they shot at trucks traveling on the interstate. Will testified that he knew when he fired his rifle that if the bullets struck a truck, property damage would result. He believed, however, that "the most it would do was make a dent." Considering the evidence, the trial court found that Will and Josh "did not intend to harm anyone, any person" and did not "reasonably expect that *such* harm [*i.e.*, bodily injuries] would result." (Emphasis added). While we agree that the evidence does not preponderate against the trial court's finding on this point, we cannot agree that it follows that the exclusionary language does not apply to the facts of this case. Stated differently, application of the *Evans* test leads us to the opposite conclusion. That is, Will and Josh shot their rifles with the intent to do *some* harm; at a minimum, they intended to damage the trucks they struck. This being so, the fact that they caused harm of a different nature, *e.g.*, bodily injuries, and of a much greater degree than they had intended, becomes irrelevant. So, too, does their mistaken belief that their bullets would not be able to penetrate a vehicle. "Only after it is established that there was an intent to inflict some manner of harm, does it follow that a mistake of fact becomes immaterial." *Evans*, 814 S.W.2d at 56, n.2. We think that the trial court was led to its conclusion that the exclusion did not apply by focusing solely on the undisputed evidence that Will and Josh never intended the specific harm they actually inflicted. Again, however, *Evans* instructs that where an intentional act is undertaken with the intention or expectation that harm will result, but harm of a different nature, character, or magnitude actually occurs, an intended or expected acts exclusion applies.

VI.

In response to the insurance company's second issue, we hold that the trial court erred in concluding that the company was contractually obligated to defend William Russell Buckner and Joshua Thomas Buckner in the underlying action. We conclude that the exclusionary provision of the policy relieves the insurance company of its obligation to defend the suits against these minor defendants.[8]

VII.

The judgment of the trial court is reversed, the counterclaims with respect to the suits against William Russell Buckner and Joshua Thomas Buckner are hereby dismissed, and judgment is entered for Metropolitan Property and Casualty Insurance Company with respect to the underlying suits against William Russell Buckner and Joshua Thomas Buckner. Costs on appeal are taxed to

---

[8] The trial court also discussed the language of the exclusion addressing "your intentional and criminal acts." Because we find the other language of the exclusion applicable, we do not need to discuss the trial court's additional holding.

-15-

John Hamel, Rosemary Hamel, Kimberly Bede, and Denise Deneau.  This case is remanded for further proceedings.


_____
CHARLES D. SUSANO, JR., JUDGE